786 P.2d 939

**Andrew TORRES; Amanda Torres, husband and wife; Walter Torres; Debra Torres, Plaintiffs–Appellants,**

v.

**GOODYEAR TIRE & RUBBER COMPANY, INC., an Ohio corporation, Defendant–Appellee.**

No. CV–89–0047–CQ.

Supreme Court of Arizona, En Banc.

Jan. 4, 1990.

Engler, Engler, Weil & Nelson by Richard D. Engler, Yuma, for plaintiffs-appellants.

Jennings, Strouss & Salmon by Jefferson L. Lankford and Jay A. Fradkin, Phoenix, for defendant-appellee.

FELDMAN, Vice Chief Justice.

In this case we are asked to consider the liability of a trademark licensor for injuries caused by defects in a product produced and distributed by its licensee. The question was certified to us by the United States Court of Appeals for the Ninth Circuit. The procedure for such certification is outlined in Rule 27, Ariz.R.Sup.Ct., 17A

A.R.S. We have jurisdiction to accept certification under A.R.S. § 12–1861 and Ariz. Const. art. 6, § 5(6). Because the issue presented is a matter of first impression under state law, we exercised our discretion in favor of accepting jurisdiction even though the case presents a unique procedural problem. *See* Rule 27(b), Ariz. R.Sup.Ct., 17A A.R.S.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Andrew and Walter Torres and their wives (plaintiffs) brought an action in United States District Court for the District of Arizona alleging that the two men were injured in an automobile accident caused by tread separation of a defective Goodyear tire. Plaintiffs discovered during the course of litigation that the tire had not been manufactured by the defendant, Goodyear Tire & Rubber Co., Inc. (Goodyear); rather, it had been produced by Goodyear Tyre & Rubber (Great Britain), Ltd. (Goodyear GB). Goodyear International Technical Center (GITC), a division of Goodyear SA of Luxembourg (Goodyear Luxembourg), designed the tire. Plaintiffs' complaint alleged four theories of liability. Three of the counts are irrelevant to the issues considered today. The fourth count alleged Goodyear was strictly liable in tort for the injuries caused by the defective product, even though it was not the corporate entity that had designed, manufactured, or distributed the product.

The district judge eventually granted summary judgment in favor of Goodyear and against plaintiffs on all counts. Evidently the judgment concluded all issues in the action brought against Goodyear. Plaintiffs appealed. Taking jurisdiction pursuant to 28 U.S.C. § 1291 (1982), a divided panel of the ninth circuit affirmed the district court on all issues. *See Torres v. Goodyear Tire & Rubber Co.*, 857 F.2d 1293 (9th Cir.1988) (*Torres I*). A sharply worded dissent expressed the view, *inter alia*, that in a diversity case to be determined by Arizona substantive law (*see Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)), the majority had decided a question of first impression under Arizona law without using the procedure available to certify the question to the Arizona Supreme Court. *Torres I*, 857 F.2d at 1299 (Noonan, J., concurring and dissenting).

Following plaintiffs' filing of a motion for rehearing *en banc*, the opinion in *Torres I* was withdrawn and an "Opinion and Order Certifying Question to the Arizona Supreme Court" was substituted. *See* 867 F.2d 1234 (9th Cir.1989) (*Torres II*). The panel was as sharply divided as it had been in *Torres I*. The difference of opinion was not confined to substantive issues of law pertaining to strict liability, but included characterization of the issue. The majority ordered that the following question be certified to this court:

> [W]hether a trademark licensor is subject to strict product liability under § 402A of the Restatement (Second) of Torts (made the law of Arizona in *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972) by reason of being either (a) a "manufacturer" or "seller" within the meaning of Ariz.Rev.Stat.Ann. §§ 12–681–686 (1982), or (b) an "integral part of an enterprise" responsible for placing allegedly defective products on the market). *See O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 447 P.2d 248 (1968) (en banc), and its progeny.

*Torres II*, 867 F.2d at 1239. Obviously, the question propounded requires an answer under both statutory and common law.

Judge Noonan again concurred and dissented. After reviewing Arizona law, he concluded:

> The question that should be certified ... is: Is a company liable in Arizona under § 402A of the Restatement (Second) of Torts for the tort of a company that it licenses to manufacture in strict accordance with its formulas, specifications and restrictions, using only materials approved by the licensor, [the question Judge Noonan would have certified continues by hypothecating many of the facts of the case].

*Torres II*, 867 F.2d at 1240.

Given the importance of the issues, however characterized, we accepted certifica-

tion but attempted to resolve the procedural problem by formulating our own question. Our order read as follows:

Pursuant to Rule 27(b), ... the Court accepts jurisdiction....

This court will decide the following issue under the questions certified:

Under the facts of this case, as indicated in the Opinion and Order of the United States Court of Appeals for the Ninth Circuit, and in the relevant record before that court, is the trademark licensor strictly liable for personal injuries caused by a defective product put into the stream of commerce by the trademark licensee?

Order, March 27, 1989.

That question was briefed and argued by counsel and is decided today.

## CERTIFICATION PROCEDURE

■ Given that principles of federalism require substantive legal issues in diversity cases be decided by application of state law, this court strives to respond affirmatively to certification requests from the federal bench. We are also moved to accept certification by considerations of comity toward our colleagues on the federal bench and responsibility to the citizens of the state. If state law is applied to decide questions in federal court, and if state law is not clear on the question involved, it is better that we fulfill our responsibility to decide the state law issue rather than leave the federal bench to speculate on what our answers might be. We believe, however, that our task would be easier and our opinions would better assist the federal bench, if the certification process itself did not become adversarial, raising questions as to exactly what issue this court is asked to decide.[1]

■ In our view also, the entire process would be better served if the questions certified to us were propounded in a factual context agreed on by counsel or formulated by the certifying court. This court generally abstains from abstract questions. *See, e.g., Mueller v. City of Phoenix ex rel. Phoenix Bd. of Adjustment II*, 102 Ariz. 575, 583, 435 P.2d 472, 480 (1967) (appellate court need not decide moot questions or abstract propositions); *Podol v. Jacobs*, 65 Ariz. 50, 56, 173 P.2d 758, 762 (1946) (Supreme Court is confined to determining the law on issues arising out of actual facts, and cannot determine what the law or rule may be upon a suppositious case).

Legal issues are much better understood when considered in light of the facts. For instance, the answer to the question whether a trademark licensor is liable under Arizona law is: sometimes yes and sometimes no, depending on the facts. Hence, in formulating the question that we wished to have counsel brief and argue, and that we were willing to decide, we were careful to specify that the "facts of this case," as they must be viewed on the current state of the record, must be presented. Order, March 27, 1989. We turn, then, to a consideration of the facts and then to consider Arizona's answer to the question formulated.

## FACTS OF THIS CASE

Fortunately, the facts seem relatively undisputed. The operative facts suggesting resolution of the strict liability issue are taken primarily from the opinions of the majority in *Torres I* and *Torres II*.

Both Andrew and Walter Torres were injured in an automobile accident allegedly caused by tread separation of a Goodyear tire on a 1977 Triumph automobile driven by Walter. The tire was original equipment on the Triumph, which had been manufactured in Great Britain and which had been purchased by Walter's wife, Debra. The tire was marked "Goodyear."

The tire was manufactured by Goodyear GB and designed by GITC. Specifications for the manufacture of the tire were issued by either Goodyear Luxembourg or Goodyear GB. *See* Goodyear's Answer to Plaintiffs' Second Set of Interrogatories No. 62,

---

**1.** We have some flexibility in answering a substantive certified question, and in so doing, the prerogative to "reframe," formulating meaningful language for our own use and that of counsel. *See Blessing v. Mason County Bd. of Educ.*, 341 S.E.2d 407, 409 (W.Va.1985).

appended to Plaintiffs' Separate Statement of Facts in Support of Plaintiffs' Response to Defendant Goodyear USA's Motion for Summary Judgment, filed Jan. 15, 1987. The European corporations mentioned are supervised by Goodyear International Corporation (Goodyear International). All of them—Goodyear GB, Goodyear Luxembourg and Goodyear International—are Goodyear subsidiaries and the stock in each, except for directors' qualifying shares, is owned by Goodyear. Through its stock ownership in the subsidiaries, Goodyear is able to elect directors to the boards of each subsidiary to ensure that they follow Goodyear's policies. Goodyear International's main office is located in the United States in the same building as Goodyear's executive offices. As the court described it, there is "commonality between some of the officers and directors of Goodyear and its subsidiaries." *Torres II*, 867 F.2d at 1235.

Goodyear's actual ability to control Goodyear GB's production of Goodyear tires is pervasive. Either directly, or indirectly through its international subsidiaries, Goodyear has the ability to design the product, provide specifications for its manufacture, and control the method of manufacture and actual production of the tire. Goodyear has reserved the right to control the quality of all tires manufactured by Goodyear GB. It sets warranty policy and honors valid warranty claims on all tires bearing the Goodyear trademark, even though, as in this case, they are actually manufactured by a subsidiary.

Goodyear's ability to control Goodyear GB is not confined to power asserted indirectly through common directors and officers. Goodyear and Goodyear GB have entered into a licensing contract that permits Goodyear GB to manufacture Goodyear tires. The licensing agreement provides that tires will be manufactured in accordance with formulas, specifications, and directions given by Goodyear, and produced from materials approved by Goodyear. Goodyear GB is also required to

comply with Goodyear's instructions on labeling, marketing, packaging, and advertising the tires.

With the perspective given by the foregoing facts, we turn now to the law of the state of Arizona.

## COMMON LAW STRICT LIABILITY

### A. Product Law in Arizona

This state long ago adopted the Restatement (Second) of Torts (Restatement) § 402 and recognized strict liability of manufacturers and sellers of defective products that were unreasonably dangerous and caused physical harm to the consumer or his property. *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 559–60, 447 P.2d 248, 251–52 (1968). The evolution of the doctrine in Arizona is described in *Stapley* and in *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972), and need not be repeated here. Both the Restatement and our cases have used the terms "manufacturer" and "seller" almost interchangeably in applying the doctrine. *See* Restatement § 402A comment f; *Stapley*, 103 Ariz. at 559, 447 P.2d at 251; *Schwartz*, 108 Ariz. at 466–68, 501 P.2d at 938–40.

The underlying objective of the doctrine was to place the risk of loss on those in the chain of distribution of defective, unreasonably dangerous goods. *Schwartz*, 108 Ariz. at 467, 501 P.2d at 939. The doctrine was considered a

> policy device to spread the risk from one to whom a defective product may be a catastrophe, to those who marketed the product, profit from its sale, and have the know how to remove its defects before placing it in the chain of distribution.

*Id.* at 467–68, 501 P.2d at 939–40. Given the policy formulation underlying strict liability, the degree of control possessed by Goodyear in the case before us is a factor that militates in favor of applying strict liability to such licensors.[2]

---

2. Goodyear suggested at oral argument that it is one thing to have the right of control and another to use it, and pointed out that this record

does not establish whether or to what extent Goodyear actually exercised its right of control. This may be correct, but we give it little weight.

These policy considerations have impelled our courts to abjure technical definitions in defining the categories of enterprise to which the doctrine of strict liability should apply. Among those who are neither manufacturers nor sellers, but who were involved in the chain of production or distribution of the product and have been subjected to strict liability, are lessors of products, donors of products, and dealers in used goods. *See, e.g., Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 660 P.2d 1236 (Ct.App.1983) (used goods); *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (Ct.App. 1978) (donor of pharmaceutical product); *Sequoia Mfg. Co. v. Halec Const. Co.*, 117 Ariz. 11, 570 P.2d 782 (Ct.App.1977) (lessor of product).

In applying the doctrine of strict liability to a lessor, our court of appeals refused to distinguish between the liability of a dealer who sold a defective automobile and one who leased the automobile. Specially concurring, Judge Jacobson wrote as follows:

> The distinction to be made is not in what capacity the dealer acts, that is, as seller or lessor, but in the nature of the defect itself, that is, was it the result of either design or manufacture?

*Lechuga, Inc. v. Montgomery*, 12 Ariz. App. 32, 38, 467 P.2d 256, 262 (1970).

We believe the decisions cited fairly indicate that in Arizona the application of strict liability does not hinge on the technical limitations of the term seller or manufacturer as used in Restatement § 402A. As Judge Jacobson indicated, "the term 'seller' is a term designating a class (one in the business of placing products in the stream of commerce) rather than a designation of limitation." *Id.*

Arizona has not yet decided whether trademark licensors may be held strictly liable for defects in the licensed product, although the application of strict liability to trademark licensors has been intimated on at least two occasions. *See Lechuga,* 12 Ariz.App. at 38, 467 P.2d at 262; *Nalbandian v. Byron Jackson Pumps, Inc.*, 97 Ariz. 280, 288, 399 P.2d 681, 686 (1965) (Lockwood, J., concurring). If we ignore the label of trademark licensor and consider only the policy objectives underlying the adoption of strict liability as described in *Schwartz,* we must focus our analysis on the character of the injury-producing conduct rather than the technical limitations of the term seller. Using this approach, the facts of this case place Goodyear well within in the class mentioned by Judge Jacobson of those "in the business of placing products in the stream of commerce," and subject to the doctrine of strict liability. *Lechuga,* 12 Ariz.App. at 38, 467 P.2d at 262.

## B. Corporate Form

In arguing that it should not be held strictly liable, Goodyear relies heavily on the separate corporate identities of each of its subsidiaries. It points out that the corporate forms were strictly maintained—as we have no doubt is the case—and that courts should not ignore corporate organization. We have no intention of doing so, but we do not believe it is good law to allow multinational firms the freedom to compartmentalize strict liability by choosing organizational forms that will require actions for defective design of a product such as this to be brought in Luxembourg, those for defective manufacture in Great Britain, those for defective labeling in a third, and the like. Goodyear, after all, does business in some fifty countries and no doubt places its different subsidiaries that contribute to research, design, and distribution in whatever location it finds most conducive to its economic well-being.

---

The record also contains no evidence that Goodyear refrained from exercising its power of control, either directly or indirectly. It would be naive, indeed, for this court to conclude that although the largest tire manufacturer in the world had complete power to control subsidiaries, it allowed them to do whatever they wished in the design, manufacture, and distribution of a product the licensor spent many millions of dollars to advertise as a symbol of quality. Of course, we leave to the circuit court the prerogative of making whatever assumptions it feels are appropriate in light of the record, but we believe it would defy economic reality to assume Goodyear is indifferent to the manufacturing policies of the wholly owned subsidiaries it licenses to produce its products.

We presume it is guided in these decisions by the realities of the marketplace.

This court must also acknowledge the realities of the marketplace when it decides cases. *See, e.g., Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200 (1983). The marketplace, as described by the facts of this case, indicates very clearly that we deal with a tire designed to be a Goodyear tire, produced, packaged, advertised, and sold as a Goodyear tire, and warranted by Goodyear. To hold, as we are asked, that when the product is defective and unreasonably dangerous it should not be considered a "Goodyear" tire but a "Goodyear GB" tire would be to espouse a doctrine that would no doubt surprise most Goodyear customers, and perhaps some officers of Goodyear itself.

## C. Other Authority

Nor have we been cited to any case that holds, under similar facts, that the doctrine of strict liability should not apply to a trademark licensor. Actually, many courts considering the issue have instead taken the view that strict liability should be applied. For example, in a case very similar to the present case, a plaintiff sought to impose strict liability on Uniroyal, Inc. for injuries caused by an allegedly defective tire manufactured and sold by Uniroyal's Belgian subsidiary, Uniroyal Englebert Belgique, S.A. *Connelly v. Uniroyal, Inc.,* 75 Ill.2d 393, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979), *cert. denied and appeal dismissed,* 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738 (1980). Noting that strict liability was intended "to place the loss caused by defective products on those who create the risk and reap the profit," the Illinois Supreme Court held as follows:

A licensor is an integral part of the marketing enterprise, and its participation in the profits reaped by placing a defective product in the stream of commerce ... presents the same public policy reasons for the applicability of strict liability which supported the imposition of such liability on wholesalers, retailers and lessors. The societal purposes underlying [*Suvada v. White Motor Co.,* 32 Ill.2d 612, 210 N.E.2d 182 (1965)—the case

adopting strict liability in Illinois] mandate that the doctrine be applicable to one who for a consideration, authorizes the use of his trademark, particularly when, as here, the product bears no indication that it was manufactured by any other entity.

*Id.* 27 Ill.Dec. at 351, 389 N.E.2d at 163; *see also Molett v. Penrod Drilling Co.,* 826 F.2d 1419 (5th Cir.1987) (non-manufacturer/seller liable when its relationship with the actual manufacturer makes it capable of controlling the quality of the merchandise); *Taylor v. General Motors, Inc.,* 537 F.Supp. 949, 952–53 (E.D.Ky.1982) (as a franchisor, General Motors exercised strict control over the design and testing of the product and therefore was "an integral part of the composite business enterprise" that was responsible for placing the fans "in the stream of commerce"); *Kasel v. Remington Arms Co.,* 24 Cal.App.3d 711, 101 Cal.Rptr. 314 (1972) (franchisors or trademark licensors that are links or participants in the marketing enterprise that results in product entering stream of commerce are strictly liable in tort); *City of Hartford v. Associated Const. Co.,* 34 Conn.Supp. 204, 384 A.2d 390 (1978) (trademark licensor of roofcoating product strictly liable in tort for property damage caused by defects in its product; facts showed licensor participated in formulation, design, manufacture, distribution, sale, and advertising of product to similar extent as Goodyear in present case); *Ogg v. City of Springfield,* 121 Ill.App.3d 25, 76 Ill.Dec. 531, 458 N.E.2d 1331 (1984) (parent company that participates in manufacture, marketing, and distribution and is in position to eliminate unsafe character of product held strictly liable). Other cases are cited in *Torres II,* 867 F.2d at 1238.

Goodyear argues that none of the cases cited stands for the proposition that a mere trademark licensor can be held strictly liable in tort. It points out that in each of the cases, the facts showed the licensor was "integrally involved in the overall producing and marketing enterprise [so] that strict liability will follow." Brief at 16 (quoting *Hebel v. Sherman Equipment,* 92

Ill.2d 368, 65 Ill.Dec. 888, 894, 442 N.E.2d 199, 205 (1982)). Goodyear is correct, but its analysis of the cases does not help its cause. If ever a defendant was involved "in the direct chain of sale leading from manufacturer to consumer" (*id.*), it is Goodyear. Goodyear evidently distinguishes these cases by an implicit extra step we refuse to take. It apparently believes that because its participation in research, design, manufacture, distribution, and sale was technically accomplished through its wholly owned subsidiaries, Goodyear is not responsible for losses caused by a defective, unreasonably dangerous product produced by the common enterprise. We do not share this view. The parent company owns the subsidiaries, designates their directors and officers, allocates the capital needed and used by the subsidiaries, and enjoys the profits made by them. Certainly the brain that so competently and thoroughly directs the entire enterprise must be liable for the acts of its appendages.

The application of strict liability to trademark licensors such as Goodyear has been endorsed by various commentators. For example:

> It can be said that all those who participate in the process of making products available to users for profit or financial gain are subject to liability on a negligence theory. This would include endorsers, *licensors of trademarks*, and franchisers,....
>
> The more difficult inquiry relates to strict liability.... The states that have passed on the question have treated the franchiser as if he were the seller, at least in those cases where many members of the general public would believe that the franchiser was either the owner, seller or at least exercising substantial control over the franchisee's processes. The licensor of a patent is often in a somewhat different position. The licensor's contract is generally nothing more than a contract authorizing the use of an alleged patent, i.e., an invention. The product sold by the licensee is generally not sold under the trade name of the licensor of the patent. The general pub-

lic is not in most instances relying on the licensor. *This is not to say the licensor may not participate to such an extent in the construction and sale of products made pursuant to a patent to justify the imposition of strict liability.*

PROSSER AND KEETON ON THE LAW OF TORTS § 100 (5th ed. 1984) (emphasis added); *see also* 2 L. FRUMER AND M. FREEDMAN, PRODUCTS LIABILITY § 3.03[4] (1988) ("We submit that the decisions [imposing strict liability] are correct and consistent with both the growth of strict products liability law and the increasing use of trademark and licensing agreements. To hold otherwise would insulate from strict product liability a substantial number of culpable distributers of defective products.").

We believe the comment quoted from Prosser accurately describes the proper common law rule. If we were to deal with "nothing but a mere licensor"—one who merely licenses a manufacturer to use a particular patent or trademark—it might well be inappropriate to impose strict liability. However, this is not an issue we need to decide today because the facts set forth in this opinion show that Goodyear is anything but a mere licensor. On the present record before us, the undisputed facts certainly could support a finding that Goodyear participated significantly in the design, manufacture, promotion, and sale that resulted in the product reaching the consumer. Because strict liability is the law in Arizona, there exists no justification based in theory or precedent for failing to apply it to such a licensor.

## D. Economic Considerations

The ninth circuit majority, however, was concerned with some economic considerations that are commonly considered by the school of law and economics. At least implicitly, we were asked to consider such matters. The court pointed out that it is "now realized that the cost of 402A insurance is very substantial" so that we are "approaching the time when fundamental assumptions with respect to § 402A will be

reexamined."[3] *Torres II*, 867 F.2d at 1238. The court went on to state:

> Questions will be raised such as: should universal compensation ... be provided by a form of national accident insurance exclusively? Or should a plan employ a combination of (a) national accident insurance, (b) individual accident insurance, (c) and a tort system based on fault? If these are visionary, should § 402A be redrawn so as to make its outer limits more precise? Or should we merely halt for the present the expansion of § 402A by judicial decision?

*Id.* at 1239.

We do not believe any of these issues, if they be that, are relevant to the present problem of whether a tire conceived and sold as a Goodyear tire for all purposes should not also be considered a Goodyear tire when it fails. We are unaware of any process by which product liability insurance premiums in the relevant economic universe will be reduced by even a trickle if the insurers for Goodyear Luxembourg or Goodyear GB rather than those for Goodyear (if there is any difference in identity between such insurers) pay the loss. Of course, it is possible that if Goodyear is not strictly liable, and *in personam* jurisdiction cannot be obtained over Goodyear GB and Goodyear Luxembourg,[4] there may be no recovery possible to compensate plaintiffs for their injuries.[5] In the absence of tort recoveries, of course, there is hope that premiums will decrease. Denying recovery to those entitled to compensation may be an effective method of reducing insurance premiums, but it hardly appears to be the optimum approach. Moreover, the grant of immunity to the American parents of foreign manufacturing subsidiaries combined with the difficulties of obtaining *in personam* jurisdiction over such foreign subsidiaries may well encourage the transfer of American manufacturing jobs to other countries. We do not believe this is good legal or economic policy.

Nor do we believe the other aspects of "economic reality" raised by the majority in *Torres II* are within our power to change. Whether there should be a system of universal compensation, national accident insurance, or individual accident insurance is a matter for the legislative forum, just as would be the necessary funding for such system. Our responsibility is to establish and apply rational rules of tort law. To hold that this tire is not a Goodyear tire would exalt form over substance. In essence, we are asked to close our eyes to economic reality and adopt a rule for tort law that no court and no legal commentator has yet recommended, so far as is shown by any citation provided us. Such a regime of tort law would not accomplish anything significant to ameliorate the problems that afflict the insurance industry. Regulation of the insurance industry cannot, and should not, be accomplished by making bad tort law.

■ We conclude, therefore, as a common law matter, trademark licensors who significantly participate in the overall process by which the product reaches its con-

---

**3.** We do not know which "fundamental assumptions" the court referred to. This court makes no fundamental assumptions regarding section 402A except that those who distribute defective and unreasonably dangerous products should pay for the damage they cause. If this is a fundamental assumption, it is one basic to both tort and criminal law. The court in *Torres II* suggests no better substitute for this rationale. As to the performance of product liability law in general, see HUMAN RESOURCES DIVISION, U.S. GENERAL ACCOUNTING OFFICE, PRODUCT LIABILITY: VERDICTS AND CASE RESOLUTION IN FIVE STATES [including Arizona], Report to the Chairman, Subcommittee on Commerce, Consumer Protection, and Competitiveness, Committee on Energy and Commerce, House of Representatives, (Sept.1989).

**4.** *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Batton v. Tennessee Farmers Mut. Ins. Co.*, 153 Ariz. 268, 736 P.2d 2 (1986).

**5.** This issue may be of more than academic interest here. Although Goodyear claims plaintiffs were granted permission to add the tire manufacturers as defendants, *see* Appellee's Brief at 2, the district court docket sheet indicates an order was entered on December 3, 1986 denying plaintiffs permission to amend the complaint to add Goodyear GB and Goodyear International as party defendants.

sumers, and who have the right to control the incidents of manufacture or distribution, are subject to liability under the rules of Restatement § 402A as adopted and applied in Arizona. Like lessors of products, they are the functional equivalent of manufacturers and sellers.

Because the liability question posited in *Torres II* also takes cognizance of Arizona statutes dealing with products liability, we turn next to an analysis of those statutes and their effect on this case.

### PRODUCT LIABILITY UNDER ARIZONA STATUTE

In 1978, our legislature adopted a series of statutes under the heading "Product Liability." *See* A.R.S. §§ 12–681 to 12–686. The legislative goal was to address the "perceived crisis of rising products liability insurance rates" and to promote new product development by controlling or regulating product liability law. *See Bryant v. Continental Conveyor Equip. Co.,* 156 Ariz. 193, 197, 751 P.2d 509, 513 (1988).[6]

First, it is important to note that the statutes expressly disclaim any limitation of the existing common law of product liability. *See* A.R.S. § 12–682. Nor do the statutes attempt to oust this court from the evolution of product liability law. They purport to do no more than establish certain affirmative defenses (A.R.S. § 12–683, pertaining to the so-called "state of the art" defense, alteration or modification as a defense, and abuse of the product); provide for indemnification between manufacturers and sellers (A.R.S. § 12–684); regulate the contents of *ad damnum* clauses (A.R.S. § 12–685); and deal with evidentiary issues

pertaining to remedial measures (A.R.S. § 12–686). No provision of the statute deals with the question of whether a lessor, a donor, a franchisor, a trademark licensor, or any similar entity should qualify as a manufacturer or seller.

■ In defining the terms, however, the statute defines manufacturer in very broad terms: one who "designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product. .." A.R.S. § 12–681(1). Plaintiffs argue that the term "otherwise prepares a product" applies to Goodyear. We agree. Surely the entity that dictates and controls the design, specifications for formulation, technique for production, quality of production, marketing, advertising, sale, and warranty of a product can qualify as one who "otherwise prepares" the product "prior to its sale." A.R.S. § 12–681(1). We believe that even if the statutes were intended to restrict what the court described in *Torres II,* 867 F.2d at 1239, as the "outer limits" of section 402A, Goodyear falls well within the definition of manufacturer in A.R.S. § 12–681.

■ We conclude, therefore, that there is nothing in the statutes that would prohibit or conflict with the application of the doctrine of strict liability in tort to Goodyear.

### CONCLUSION

The answer to the question certified and accepted is that under Arizona law a trademark licensor may be held liable where a licensee marketed the defective, unreason-

---

**6.** So far as we can determine, the adoption of these statutes has not accomplished the legislature's goals. Premiums for Arizona manufacturers are not reported to be lower than those in other places, and we have noticed no trend of manufacturers fleeing California and locating in Arizona, where the reduced exposure to strict liability in tort would promote the development of new products. Indeed, it appears that in California, where under the *Kasel* rule a trademark licensor is strictly liable in tort, there has been a great influx of capital, leading to the establishment of many new firms specializing in the development of new, "hi tech" products. We are aware, of course, that development of

some types of new products, such as certain drugs, may be more directly affected by product liability law. *See, e.g.,* Restatement § 402A comment k (immunizes manufacturers of some products that are unavoidably unsafe); *Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374, 380–81 (1984) (although generally principle of strict liability is applicable to manufacturers of prescription drugs, in some circumstances doctrine of strict liability may be inapplicable). If special exceptions are required for such products, it might be appropriate to consider such rules when the cases are presented. But we deal here with tires, not a new vaccine for AIDS.

ably dangerous product as the licensor's, where the licensor's relationship with the technical manufacturer or seller made it a significant participant in the enterprise by which the product is brought to market, and where the licensor controlled or had the ability to control the design, manufacture, or quality of the merchandise. Of course, we considered this case under the record provided us, essentially one involving summary judgment proceedings, and make no prediction as to the actual state of facts that may ultimately be established in this case or the proper outcome of the case when the legal principles we enunciate here are applied to the facts.

GORDON, C.J., and CAMERON, MOELLER and CORCORAN, JJ., concur.