Jo Anne BEARD and Bradley
C. Brockman, Plaintiffs,

v.

Donna Marie VIENE and the City
of Kansas City, Missouri,
Defendants.

No. 77023.

Supreme Court of Oklahoma.

Feb. 25, 1992.

---

John H. Tucker, William S. Leach, Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, and Michael R. Conner, Stanley C. Fickle, and Arend J. Abel, Barnes & Thornburg, Indianapolis, Ind., for plaintiffs.

W. Michael Hill, Melvin C. Weiman, and Edward J. Main, Tulsa, for defendants.

OPALA, Chief Justice.

The United States District Court for the Northern District of Oklahoma certified for this court's answer the following question posed pursuant to the Uniform Certification of Questions of Law Act, 20 O.S.1981 §§ 1601 et seq.: Whether, as a matter of interstate comity, the State of Oklahoma will recognize and enforce a limitation on the tort liability of a municipality of a sister state pursuant to the law of that sister state, when the limitation on tort liability to be recognized and enforced is identical in amount to the limitation of tort liability for Oklahoma municipalities imposed under Oklahoma law?

As qualified by our analysis below, we answer in the affirmative and hold that, under the principle of comity, Oklahoma will recognize a limitation on the municipal tort liability of a sister state.

## ANATOMY OF FEDERAL LITIGATION

The plaintiffs, Jo Anne Beard and Bradley C. Brockman [Beard and Brockman], are citizens and residents of the State of Illinois. The defendant, the City of Kansas City, Missouri [Kansas City], is a municipal corporation, organized and existing under the laws of the State of Missouri. And the defendant, Donna Marie Viene [Viene], was an employee of Kansas City through its Parks and Recreation Department. While in a vehicle owned by Beard and operated by Brockman on March 5, 1989, Beard and Brockman were injured in an automobile collision with Viene who, in the course of her employment, was driving a vehicle owned by Kansas City. The collision occurred on the Will Rogers Turnpike in Ottawa County, Oklahoma, near mile marker 328.4, approximately 15.4 miles east of the City of Miami, Oklahoma. Beard and Brockman commenced separate actions in the United States District Court for the Eastern District of Oklahoma, which were later transferred to the Northern District of Oklahoma and consolidated. Kansas City sought a "partial summary judgment" asserting that (1) as shown by Mo.Rev.Stat.

§ 537.600,[1] the State of Missouri adheres to the doctrine of governmental tort immunity; (2) by the terms of Mo.Rev.Stat. § 537.-600(1), the immunity of the political subdivisions of the State of Missouri is waived, except to the extent provided for in Mo. Rev.Stat. § 537.610,[2] which limits recovery for tort liability arising out of a single transaction involving the negligent operation of a motor vehicle by an employee in the course of their employment, to the statutory maximum of $100,000.00 per person; (3) Oklahoma's Governmental Tort Claims Act[3] contains a similar limitation on the

1. Mo.Rev.Stat. § 537.600 (1985) provides in part:

"537.600 Sovereign immunity in effect—exceptions—waiver of

"1. Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that, the immunity of the public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances:

(1) Injuries directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment;

*    *    *    *    *    *

2. The express waiver of sovereign immunity in the instances specified in subdivisions (1) and (2) of subsection 1 of this section are absolute waivers of sovereign immunity in all cases within such situations whether or not the public entity was functioning in a governmental or proprietary capacity and whether or not the public entity is covered by a liability insurance for tort."

The quoted portions were not changed by a subsequent amendment to the statute (L.1989, H.B. No. 161, § A, eff. July 14, 1989).

2. Mo.Rev.Stat. § 537.610 (1978) provides in part:

"537.610 Liability insurance for tort claims may be purchased, by whom—limitations on waiver of immunity—apportionment of settlements

"1. * * * Sovereign immunity for the state of Missouri and its political subdivisions is waived only to the maximum amount of and only for the purposes covered by such policy of insurance purchased pursuant to the provisions ... provided in any self-insurance plan duly adopted by the governing body of any political subdivision of the state.

2. The liability of the state and its public entities on claims within the scope of sections 537.600 to 537.650, shall not exceed eight hundred thousand dollars for all claims arising out of a single accident or occurrence and shall not exceed one hundred thousand dollars for any one person in a single accident or occurrence, * * *"

A 1989 amendment substituted "one million dollars" for "eight hundred thousand dollars" in subsec. 2 (L.1989, H.B. No. 161, § A, eff. July 14, 1989).

3. The Governmental Tort Claims Act is codified in 51 O.S.1981 §§ 151 et seq.

The terms of 51 O.S.Supp.1987 § 152 provided in pertinent part:

"As used in this act, Section 151 et seq. of this title:

*    *    *    *    *    *

7. 'Municipality' means any incorporated city or town, and all institutions, agencies or instrumentalities of a municipality....

8. 'Political subdivision' means:

a. a municipality;

*    *    *    *    *    *

and all their institutions, instrumentalities or agencies."

The quoted portions were not changed by subsequent amendments to the statute (Okl. Sess.L.1989, Ch. 286 § 8, eff. May 24, 1989, Okl.Sess.L.1990, Ch. 313 § 1, eff. May 30, 1990 and Okl.Sess.L.1991, Ch. 55 § 3, Ch. 250 § 6, eff. Sept. 1, 1991).

The terms of 51 O.S. Supp.1984 § 153 provide in pertinent part:

"A. The state or a political subdivision shall be liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment subject to the limitations and exceptions specified in this act and only where the state or political subdivision, if a private person or entity, would be liable for money damages under the laws of this state. * * *

B. The liability of the state or political subdivision under this act shall be exclusive and in place of all other liability of the state, a political subdivision or employee at common law or otherwise."

The terms of 51 O.S.Supp.1988 § 154 provided in pertinent part:

"A. The total liability of the state and its political subdivisions on claims within the scope of this act, ... arising out of an accident or occurrence happening after the effective date of this act, ... shall not exceed:

1. Twenty-five Thousand Dollars ($25,-000.00) for any claim or to any claimant who has more than one claim for loss of property arising out of a single act, accident, or occurrence;

2. One Hundred Thousand Dollars ($100,-000.00) to any claimant for his claim for any other loss arising out of a single act, accident, or occurrence ...; or

3. One Million Dollars ($1,000,000.00) for any number of claims arising out of a single occurrence or accident. * * *"

tort liability of its political subdivisions; and (4) because the State of Oklahoma recognizes a limitation on municipal tort liability and inasmuch as Kansas City is a defendant in an adjudicative proceeding in the State of Oklahoma, the principle of comity dictates that Oklahoma recognize the limitation on the municipal tort liability of Kansas City by precluding recovery in excess of Missouri's statutory maximum.

## ANALYSIS, DISCUSSION AND ANSWER

At the outset, we encounter certain semantical difficulties in the language of the certified question.[4] First, the statutory limitations on municipal tort liability in Oklahoma and Missouri are not identical. Title 51 O.S.Supp.1988 § 154(A)(1) establishes a $25,000.00 cap on the recoverability by any one person for *property damage* arising out of a single transaction.[5] In addition, 51 O.S.Supp.1988 § 154(A)(2) establishes a $100,000.00 cap on the recoverability by any one person for *bodily injuries* arising out of a single transaction.[6] These two provisions operate to provide a maximum recoverable tort liability of $125,-000.00 by any one person. This is in contradistinction to the *maximum recoverable tort liability* (for property and bodily

damage) of $100,000.00 under the applicable Missouri statutes.[7]

Second, in the context in which they are used, the terms "recognize" and "enforce" appear ambiguous. At one level of discourse, the term "recognize" *assumes* the existence of a dispositive rule of law that is both valid and applicable. At the other level, the term "recognize" denotes not merely an assumption that there exists a dispositive rule of law, but an inquiry into whether a normative rule of law in fact exists and is applicable to a particular dispute, which in this instance would necessitate a substantial examination into the content of Missouri law, needlessly embroiling this court in the merits of the parties' action.[8] Against this latter interpretation, we narrowly construe the term "recognize" to assume, without deciding, the dispositive character of the limitation on the municipal tort liability of Kansas City in the State of Missouri.[9]

As a juristic concept, enforcement is an exercise of power concomitant with sovereignty. But the term "enforce" also implies that a foreign rule of law is capable of being enforced in the courts of a second, distinct sovereign power. While this statement merely recognizes the well-settled rule that the courts of a sovereign state may enforce the laws of another sovereign

---

The quoted portions were not changed by subsequent amendments to the statute (Okl. Sess.L.1990, Ch. 51 § 115, eff. April 9, 1990 and Okl.Sess.L.1991, Ch. 250 § 7, eff. Sept. 1, 1991).

**4.** We note that under the generally prevailing rule this court possesses the necessary power to reformulate ambiguously phrased certified questions of law. *See, e.g., Torres v. Goodyear Tire & Rubber Co.,* 163 Ariz. 88, 786 P.2d 939, 941 n. 1 (1990); *Penn Mut. Life Ins. Co. v. Abramson,* 530 A.2d 1202, 1207 (App.D.C.1987); *Meckert v. Transamerica Ins. Co.,* 742 F.2d 505, 507 (9th Cir.1984); *Kelley v. Integon Indem. Corp.,* 726 F.2d 1519, 1521 (11th Cir.1984). *See also* 17A C. Wright, A. Miller & E. Cooper, Federal Practice And Procedure § 4248, at 177–78 (1988). By narrowly construing the certified question's ambiguously phrased language, we avoid the necessity of reformulation.

**5.** *See supra* note 3.

**6.** *See supra* note 3.

**7.** *See supra* notes 1–2.

**8.** Beard and Brockman contend that, when Kansas City acts in a proprietary—as opposed to a governmental—capacity, Missouri's statutory limit on municipal tort liability does not apply. Whether the law of Missouri would lift for this case the statutorily specified cap on recoverability is a question outside the scope of the certification order. We express no opinion on this point of Missouri law. *See infra* note 9 and accompanying text.

**9.** We are buttressed in this conclusion by our recognition that ordinarily "the law of a sister state is a question of fact as distinguished from a question of law. . . ." *Kennedy v. Chadwell,* 193 Okl. 304, 142 P.2d 979 (1943) (syllabus 4). *See also* R. Leflar, American Conflicts Law § 130, at 259–60 (3d ed.1977). Moreover, as we noted in *Aetna Casualty and Sur. Co. v. Craig,* Okl., 771 P.2d 212 (1989), the "correctness of the conclusion so reached by the federal court from the facts in this case has not been tendered . . . for our legal analysis. . . . It is plainly not subject to this Court's . . . review." *Id.* at 214.

state,[10] such a rule is inapplicable as an analytical foundation for an answer to the posited question. Rather, the conceptual predicate is one of *respecting* the "limitations on ... [Missouri's] statutory waiver of its immunity from suit."[11] In the courts of Oklahoma, *this respect* is afforded and applied solely, if at all, as a matter of comity. The characterization of applying a limitation on the municipal tort liability of a sister state under principles of comity as "enforcement" is simply inapposite.

■ The question certified for our answer presents a matter of relatively recent development in American jurisprudence.[12] Where nearly every state has to some extent waived the traditional doctrine of sovereign immunity in its own courts to permit recovery for governmental torts, the "privilege of immunity" afforded in the courts of sister states has been brought to fore-

front,[13] implicating in the process the very fundaments of "Our Federalism." Ultimately, the resolution of this question reposes in the interstices of the common-law principle of comity, contemporary approaches to conflict-of-laws analysis, and the full faith and credit clause of the United States Constitution.[14] But absent a legislative mandate from Congress or definable guidelines from the United States Supreme Court, courts have been left the task of establishing parameters for such questions through the jurisprudence in the respective states.

As a matter of decisional law,[15] Oklahoma subscribes to the principle of comity, where comity seeks "to reconcile the territoriality (sovereignty) of states with the need for consideration of foreign law in appropriate cases."[16] But that Oklahoma subscribes to the principle of comity is not

---

**10.** See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 100 (1969) [hereinafter RESTATEMENT]. This is not to imply that the courts of a sovereign state have unfettered discretion in all instances. As *Bradford Electric Co. v. Clapper,* 286 U.S. 145, 52 S.Ct. 571, 76 L.Ed. 1026 (1931) makes clear, "in certain limited situations, the courts of one State must apply the statutory law of another State." *Nevada v. Hall,* 440 U.S. 410, 421, 99 S.Ct. 1182, 1188, 59 L.Ed.2d 416 (1979).

**11.** *Hall, supra* note 10, 440 U.S. at 421, 99 S.Ct. at 1188.

**12.** *See id.* at 417 n. 13, 99 S.Ct. at 1186.

**13.** *See id.* at 418, 99 S.Ct. at 1187.

**14.** As noted by the United States Supreme Court in *Wells v. Simonds Abrasive Co.,* 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211 (1953), "[t]he Full Faith and Credit Clause does not compel a state to adopt any particular set of rules of conflict of laws; it merely sets certain minimum requirements which each state must observe when asked to apply the law of a sister state." *Id.* at 516, 73 S.Ct. at 857. Moreover, where these minimum requirements are satisfied, the "conflicts of law embodied in the Full Faith and Credit Clause allows room for common-law development." *Sun Oil Co. v. Wortman,* 486 U.S. 717, 723 n. 1, 108 S.Ct. 2117, 2122, 100 L.Ed.2d 743 (1988). As these statements indicate, the Court's full-faith-and-credit-clause analysis merely establishes a minimum floor in the context of conflict of laws, leaving to the respective states the development of a ceiling through their decisional law. That is, as with other constitu-

tional commands, the states are free to develop beyond the federal constitution's minimal standards. *See* R. ROTUNDA, J. NOWAK & J. YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 1.6(c), at 31–33 (1986). This analysis is indispensable in the complex area of multistate relations and in the furtherance of our cooperative federalism.

**15.** As we noted in *Clampitt v. Johnson,* Okl., 359 P.2d 588, 592 (1961), "judicial comity is not a rule of law, but one of practical convenience and expediency...." *See also, e.g., Lee v. Miller County, Ark.,* 800 F.2d 1372, 1375 (5th Cir.1986).

**16.** E. SCOLES & P. HAY, CONFLICTS OF LAW § 2.4, at 13 (1982). Although comity originated as a harmonizing principle of international law, the doctrine was adopted early on in the American common law. *See id.* As a matter of internal domestic effect, the notion of comity has perhaps best been summed as follows:

"[A] proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.... The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the

dispositive as to its application in all instances; i.e., that comity is the principle with which to resolve certain multistate situations is not the end, but the beginning of the analytical process. Accordingly, our determination to apply the laws of Missouri and to extend the benefits of that state's immunity in the courts of Oklahoma must depend on a careful balancing of multiple factors. Under this formulation, § 145 of the Restatement of Conflict of Laws provides the guiding rule.[17]

"[W]ith respect to an issue in tort," this section, according to its express language, is an effectuating provision, designed to attain the underlying choice-of-law principles stated in § 6 of the Restatement.[18] Generally characterized as the "most significant relationship" test, § 145 requires a court to weigh the relative contacts in order to determine the applicable substantive law in a rational fashion.[19] Consistently with this approach, we must evaluate not only the four listed factors, but also, other more dispositive factors in determining the "most significant contacts."

The first two factors of § 145, *place of injury* and *place of conduct causing inju-*

National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 750–751, 27 L.Ed.2d 669 (1971).

17. RESTATEMENT, *supra* note 10, § 145 provides:
"(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue."

18. RESTATEMENT, *supra* note 10, § 6 provides:
"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include[:]
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied."

19. *See Collins Radio Co. v. Bell*, Okl.App., 623 P.2d 1039, 1046 (1980). By "applicable substantive law," we do not imply that any law other than the law of Oklahoma is applicable in this instance. As we have noted, our respect for Missouri's limitations on municipal tort liability in the courts of Oklahoma must be accorded solely, if at all, as a matter of comity. In this sense, both §§ 145 and 6 are somewhat inapposite as frameworks for our analysis under the facts of this certified question. That this is true is discernible from the acknowledged purpose of § 6 of the Restatement.

Section 6 reflects the American Law Institute's effort to codify the principle of choice of law in conflict of laws. The traditional choice-of-law approach contemplates those rules "which provide for the application of the local law of one state, rather than the local law of another state...." RESTATEMENT, *supra* note 10, § 6 comment a. *See also* R. WEINTRAUB, COMMENTARY ON THE CONFLICT OF LAWS § 7.3C (2d ed. 1980). But where comity is extended to afford respect to a sister state's laws, rather than an application of choice-of-law rules to enforce a sister state's laws, the Restatement's caveat that, in the complex sphere of multistate relations, rarely will a court "find that a question of choice of law is explicitly covered by a statute," RESTATEMENT, *supra* note 10, § 6 comment b, seems particularly telling.

That the text of the Restatement on traditional choice-of-law rules fails to cover the present factual situation is not dispositive. Rather, the most which may be said is that, due to the recent phenomena of states waiving their "privilege of immunity," traditional choice-of-law rules have merely failed to catch up with the rapid development of the common law in this area. Moreover, the Restatement itself specifically notes that many choice-of-law issues have not been fully explored by the courts, indicating the necessity for choice-of-law rules to expand to fill the otherwise present vacuum in the law. The counsel of the Restatement is instructive: "All that can presently be done in these areas is to state a general principle, ... which provides

*ry*, both point to Oklahoma law, since both of these elements occurred in Oklahoma. In addition, the last factor, *place where parties' relationship is centered*, is wholly irrelevant to the present inquiry, leaving the third factor, *nationality of the parties*, for our analysis.[20]

Admitting the relevance of § 145(c), we can conceive of no greater "significant contact" than where a state or its political subdivision is a party defendant. Moreover, recognizing that the Restatement's textually demonstrable criteria are not the exclusive yardstick for assessment of all contacts, we note that certain quanta of significance must also attach to a governmental employee engaged in a governmental mission in the furtherance of a governmental purpose. These conjoined contacts, although not dispositive, are substantial factors in the evaluation matrix.

As earlier mentioned, § 145 is an effectuating provision. While the stated principles of § 6 of the Restatement are the target of § 145, they also express readily identifiable criteria for our evaluation. As the comments to § 6 indicate, the "needs of the interstate … system[ ]"[21] are substantial factors in the resolution of choice-of-law problems.[22] Under this criterion, courts often will give deference to the needs and policies of sister states,[23] recog-

nizing always "[t]he intimate union of these states, as members of the same great political family."[24] Indeed, these factors are all the more compelling when considered in the context of the principle of comity, where the underlying justifications of the principle are little more than overt expressions of the political necessity to "foster cooperation, promote harmony, and build goodwill"[25] among the states. Moreover, such a rule of accommodation has the secondary effects of promoting predictability, uniformity,[26] and reciprocity among the states.

■ Of the evaluative criteria listed in § 6 of the Restatement, "the relevant policies of the forum"[27] and "the relevant policies of other interested states"[28] are the most determinative for our consideration. That both the State of Oklahoma and the State of Missouri statutorily limit recoverability for municipal tort liability is uncontrovertible.[29] Where a state legislature, subject to constitutional constraints, promulgates legislation which delineates the permissible limits on waiver of the "privilege of immunity," that legislation unequivocally constitutes the public policy of the state.[30] Indeed, in the case of Oklahoma, we can conceive of no more eloquent statement of her public policy than where a

---

some clue to the correct approach but does not furnish precise answers." *Id.* § 6 comment c.

**20.** While we recognize that Restatement § 145(c) speaks in terms of the parties' nationality, we think the citizenship of a sovereign state is sufficient to qualify under the provision's rubric. This is born out by the other indicia of the subsection, such as domiciliary, residence, place of incorporation, and place of business. *See supra* note 17. Accordingly, it cannot be controverted that a political subdivision of a sovereign state qualifies for purposes of the subsection.

**21.** RESTATEMENT, *supra* note 10, § 6. *See also supra* note 18.

**22.** *Id.* § 6 comment d. Although the comments to § 6 are concerned primarily with traditional choice-of-law problems, the appellation seems appropriate for the present inquiry.

**23.** *See Panama Processes v. Cities Serv. Co.,* Okl., 796 P.2d 276, 284 (1990).

**24.** *Bank of Augusta v. Earle,* 38 U.S. (13 Pet.) 519, 590, 10 L.Ed. 274 (1839).

**25.** *Lee, supra* note 15, 800 F.2d at 1375.

**26.** To the extent predictability and uniformity of results obtain between sister states, forum shopping will be minimized. *See* RESTATEMENT, *supra* note 10, § 6 comment i. Although not an objective to be pursued at all costs, discouraging forum shopping between the states is nonetheless an important value. *See id.*

**27.** RESTATEMENT, *supra* note 10, § 6. *See also supra* note 18.

**28.** RESTATEMENT, *supra* note 10, § 6. *See also supra* note 18.

**29.** *See supra* notes 1–3.

**30.** *See Nguyen v. State,* Okl., 788 P.2d 962, 964 (1990), where we noted that the enactment of the Governmental Tort Claims Act constituted a "major policy statement[ ]" of the Oklahoma legislature.

common-law doctrine is revived by the legislature *after* its abrogation by the courts.[31]

While there is nothing in the statutory language to indicate the Oklahoma legislature's intent to apply extraterritorially the Governmental Tort Claims Act,[32] there is an obvious intent to limit recoverability for the torts of the state and its political subdivisions.[33] Whether claims be prosecuted in the courts of Oklahoma or in those of a sister state, Oklahoma's interest, as embodied in the Act, lies in limiting recoverability to the statutorily specified maximum. Given this express statement of policy, a rule which extends to the State of Missouri the benefit of her own recovery limit not only fosters cooperation and promotes harmony between our two states, but also may be seen as a measure to effectuate the intent of the Oklahoma legislature in promulgating the Governmental Tort Claims Act.[34]

Against these criteria, we must balance "the basic policies underlying the particular field of law." [35] From its earliest beginnings, one of the primary objectives of the common law has been to redress civil wrongs.[36] And in no small way, the common law has continued its advance against civil wrongs through the development of an entire field of jurisprudence—the law of torts.[37] Redress for harm from negligent acts is a policy objective firmly entrenched in the common law of every state. But even more deeply rooted in the history of our Anglo–American legal tradition has been the doctrine of sovereign immunity.[38]

Adopted in the early days of our republic,[39] the doctrine has been, in one form or another, embedded in American jurisprudence. And although many inroads have been crafted, most jurisdictions continue to retain, either as a matter of their common law or through legislative enactments, some vestiges of the traditional doctrine. In the face of explicit legislation limiting the waiver of the "privilege of immunity" to preclude recoverability for municipal tort liability in excess of the statutorily specified amount, it is now too late for this court to assess the wisdom of that policy determination.[40] On balance, we cannot say that "the basic policies underlying the particular field of law" [41] outweigh the oth-

---

**31.** "*Vanderpool* [*v. State*, Okl., 672 P.2d 1153 (1983)] abrogated only the common law doctrine of sovereign immunity and left unaffected the power of the legislature to regulate governmental tort liability. In response to *Vanderpool* the legislature enacted the Governmental Tort Claims Act in 1985...." *Id.*

**32.** *See supra* note 3.

**33.** *See supra* note 3.

**34.** As we noted in *Panama Processes*, the notion of reciprocity, at least as applied in the international arena, has increasingly come under attack. *See Panama Processes, supra* note 23, 796 P.2d at 281 n. 17. The Restatement expresses a like sentiment with respect to private parties. *See* RESTATEMENT, *supra* note 10, § 6 comment k. But this criticism seems inapposite in the context of fostering multistate relations. Indeed, as the Restatement notes, state legislatures often employ a principle of reciprocity to achieve specific objectives. *Id.*

**35.** RESTATEMENT, *supra* note 10, § 6. *See also supra* note 18.

**36.** *See generally*, C. FIFOOT, HISTORY AND SOURCES OF THE COMMON LAW 66–92 (1949 & photo. reprint 1970); Dix, *The Origins of the Action of Trespass*

*on the Case*, 44 YALE L.J. 1142 (1937); *Plucknett*, Case and the Statute of Westminster II, 31 COLUM.L.REV. 778 (1931). *See also, e.g.,* Reynolds v. Clarke, 1725, 1 Stra. 634, 2 Ld. Raym. 1399, 92 Eng.Rep. 410; Day v. Edwards, 1794, 5 Term Rep. 649, 101 Eng.Rep. 361; Leame v. Bray, 1803, 3 East 593, 102 Eng.Rep. 724.

**37.** "Not until yesterday, as legal generations go, did torts achieve recognition as a distinct branch of the law." D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON TORTS 1 (5th ed. 1984).

**38.** Indeed, as it developed at common law, the doctrine originated in the feudal system. *See* 1 F. POLLOCK & F. MAITLAND, HISTORY OF ENGLISH LAW 518 (2d ed. 1899).

**39.** *See Osborn v. Bank of United States*, 22 U.S. (9 Wheat) 738, 6 L.Ed. 204 (1824).

**40.** Indeed, a contrary determination would result in the anomalous situation of placing this court in direct contravention of the declared public policy of the legislature. *See supra* notes 30–31.

**41.** RESTATEMENT, *supra* note 10, § 6. *See supra* note 18.

er evaluative criteria.[42]  Accordingly, under the principle of comity, Oklahoma will "recognize" the recovery limit on the municipal tort liability of the State of Missouri, affording deferential respect to the applicable Missouri statutes.[43]

CERTIFIED QUESTION ANSWERED.

LAVENDER, DOOLIN, HARGRAVE, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

SIMMS, J., concurs in judgment.

HODGES, V.C.J., dissents.

---

**42.**  We find no basis here for invoking a public policy exception to the principle of comity.

**43.**  Cognizant as we are of Oklahoma's constitutionally derived public policy against limitations on death awards (*Roberts v. Merrill*, Okl., 386 P.2d 780, 782–787 (1963), we express no opinion on whether our analysis here would also apply, under identical circumstances, to protect a state or its political subdivision in an action involving injuries which result in death.  *See* OKLA. CONST. ART. 23, § 7, which provides:

"*The right of action to recover damages for injuries resulting in death shall never be abro-gated, and the amount recoverable shall not be subject to any statutory limitation,* provided however, that the Legislature may provide an amount of compensation under the Workers' Compensation Law for death resulting from injuries suffered in employment covered by such law, in which case the compensation so provided shall be exclusive, and the Legislature may enact statutory limits on the amount recoverable in civil actions or claims against the state or any of its political subdivisions." (Emphasis added.)