IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| BRIDGESTONE/FIRESTONE NORTH | ) | 2 CA-CV 2003-0115 |
| AMERICA TIRE, L.L.C., a Delaware | ) | DEPARTMENT B |
| Limited Liability Company, | ) | |
| | ) | O P I N I O N |
| Plaintiff/Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A.P.S. RENT-A-CAR & LEASING, | ) | |
| INC., an Arizona corporation, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20015988

Honorable Lina S. Rodriguez, Judge

AFFIRMED

Fennemore Craig
  By Timothy Berg, Christopher L. Callahan,
  Darcy R. Renfro, and William L. Thorpe                          Phoenix
                                        Attorneys for Plaintiff/Appellant


Jones, Skelton & Hochuli, P.L.C.
  By Donald L. Myles, Jr., Les S. Tuskai, and
  Randall H. Warner

                                                                 Phoenix
                                       Attorneys for Defendant/Appellee

P E L A N D E R, Presiding Judge.

**¶1** This declaratory relief action (DRA), which arises from an underlying product liability action (the Naranjo case), involves the seller's claim for indemnity against the manufacturer. The manufacturer, appellant Bridgestone/Firestone North America Tire, L.L.C., appeals from the trial court's grant of summary judgment in favor of the seller, appellee A.P.S. Rent-A-Car & Leasing, Inc.[1] Based on both statutory and common law grounds, the trial court ordered Bridgestone to indemnify A.P.S. for thirty percent of the judgment entered against A.P.S. in the Naranjo case. Bridgestone challenges that ruling on various legal grounds and argues numerous issues of material fact preclude summary judgment.

**¶2** This appeal requires us to analyze and apply A.R.S. § 12-684(A). The primary issue is whether that statute is a stand-alone, independent basis for indemnity, as A.P.S. contends and the trial court ruled, or whether the statute must be construed consistently with various common law principles, as Bridgestone argues. Because we find no genuine issues of material fact and agree with A.P.S.'s legal position, we conclude Bridgestone was

---

[1]Although A.P.S. actually leased rather than sold the product, lessors and sellers are treated the same for product liability purposes. *See* A.R.S. § 12-681(7) ("'Seller'" includes a "lessor, engaged in the business of leasing any product . . . for . . . use[] or consumption."); *Torres v. Goodyear Tire & Rubber Co.*, 163 Ariz. 88, 92, 786 P.2d 939, 943 (1990) (lessors of products and dealers in used goods may be subject to strict liability); Restatement (Third) of Torts, Products Liability §§ 8, 20(b) (1998).

obligated to indemnify A.P.S. under § 12-684(A). We therefore affirm the trial court's judgment on that basis.

## BACKGROUND

**¶3**     We view the facts and reasonable inferences therefrom in the light most favorable to the party against whom summary judgment was entered, here Bridgestone. *Link v. Pima County*, 193 Ariz. 336, ¶ 12, 972 P.2d 669, 673 (App. 1998). On February 18, 2001, A.P.S. rented a van to the Naranjo family. A few days later, one family member was killed and several others injured when the van's right rear tire suddenly failed, causing the vehicle to roll and crash. The failed tire was manufactured in Mexico in 1998.

**¶4**     In March 2001, the Naranjos sued only A.P.S., alleging negligence and strict liability in tort. In May, A.P.S. tendered its defense to Bridgestone, the tire's alleged manufacturer, by sending a letter and a copy of the complaint to Bridgestone headquarters in Tennessee. Bridgestone received the tender of defense but did not formally respond. A.P.S. therefore defended itself in the Naranjo case, named Bridgestone as a non-party at fault,[2] and unsuccessfully attempted to bring Bridgestone into the case as a third-party defendant. Bridgestone, however, took certain steps to monitor the Naranjo case.

---

[2]Although the record contains A.P.S.'s notice naming Bridgestone as a non-party at fault, the verdict form submitted to the jury in the Naranjo case did not include Bridgestone. Nonetheless, the parties in that case essentially treated Bridgestone as a non-party at fault throughout the trial. *See Bridgestone/Firestone North America Tire, L.L.C. v. Naranjo*, 206 Ariz. 447, ¶ 16, 79 P.3d 1206, 1210 (App. 2003).

**¶5** During trial in that case, A.P.S. essentially admitted the tire in question was defective and never disputed that the tire was unreasonably dangerous when A.P.S. rented the van to the Naranjos. In fact, A.P.S. presented expert testimony and argued that the tire was defective due to a design or manufacturing defect. Based on A.P.S.'s evidence and concessions, the trial court directed a verdict in favor of the Naranjos on their strict liability claim and instructed the jury that A.P.S. "was at fault for product liability for leasing a vehicle to the [Naranjos] with defective and unreasonably dangerous tires."

**¶6** After a seven-day trial, the jury awarded $9,539,838 in compensatory damages to the Naranjos. In response to a special interrogatory, the jury stated that seventy percent of its verdict was based on the Naranjos' negligence claim and thirty percent on their product liability claim.[3] A.P.S. paid the entire amount of the ensuing judgment, and the Naranjos filed a satisfaction of judgment with the trial court.

**¶7** While the Naranjo case was pending, Bridgestone filed this DRA, seeking a ruling that it would neither be bound by any judgment in the Naranjo case nor obligated to indemnify A.P.S. for any damages awarded to the Naranjos. Bridgestone alleged that its Mexican subsidiary, Bridgestone/Firestone de Mexico (BFMX), had actually manufactured the failed tire and, therefore, A.P.S.'s tender of defense to Bridgestone was not proper.

---

[3]The Naranjos' negligence claim, and presumably the seventy percent portion of the verdict the jury allocated to that claim, rested on allegations that A.P.S. had failed to inspect the subject tire, warn the Naranjos of a prior incident involving another virtually identical tire on the same vehicle, or replace the other tires after that prior incident. *See* n.7, *infra*.

Bridgestone further claimed that A.P.S.'s own negligence and a conflict of interest between itself and A.P.S. would defeat any claim for indemnity. A.P.S. responded with a counterclaim for indemnity and contribution against Bridgestone.[4]

¶8       Following the verdict in the Naranjo case, A.P.S. moved for summary judgment in this DRA, arguing that Bridgestone had been properly "vouched in" to the Naranjo litigation and that, pursuant to § 12-684, Bridgestone was required to indemnify A.P.S. for the product liability portion (thirty percent) of the verdict. In its response and cross-motion for partial summary judgment, Bridgestone argued it was not the manufacturer on whom A.P.S.'s tender of defense should have been served. In addition, Bridgestone contended A.P.S. had not diligently defended the product liability claim in the Naranjo case, but rather, had "actively blamed" Bridgestone at trial for the defective tire. Consequently, Bridgestone denied any obligation to indemnify A.P.S. for the resulting verdict. Bridgestone also argued it should not be bound to any part of the judgment rendered in the Naranjo case because a conflict of interest had prevented it from assuming A.P.S.'s defense. Bridgestone acknowledged it ultimately might have to indemnify A.P.S. for some portion of that

---

[4]The Naranjos, whom Bridgestone also named as defendants in this DRA, counterclaimed against Bridgestone for negligence and strict liability in tort based on the defective tire. We previously affirmed the trial court's summary judgment in favor of Bridgestone on the Naranjos' counterclaim. *Bridgestone/Firestone North America Tire, L.L.C. v. Naranjo*, 206 Ariz. 447, 79 P.3d 1206 (App. 2003).

judgment but claimed that a trial was necessary to determine the parties' relative degrees of fault and liability.[5]

¶9 After further briefing and argument, and after taking judicial notice of the entire record in the Naranjo case (over which it also had presided), the trial court granted summary judgment in favor of A.P.S. and denied Bridgestone's cross-motion. The court ruled that Bridgestone was the manufacturer of the tire and had received and refused a proper tender of defense from A.P.S. Concluding that Bridgestone had not established either of the two statutory exceptions in § 12-684(A) and that its various common law defenses were inapplicable, the court ordered Bridgestone to indemnify A.P.S. for $2,861,951.40, thirty percent of the damages awarded to the Naranjos. The trial court also grounded its ruling on "common law vouching in and indemnification" and on A.P.S.'s contribution claim "for 30 percent of the Naranjo Judgment."

¶10 Bridgestone filed a motion for reconsideration, reurging the arguments made in its cross-motion for partial summary judgment. Bridgestone also argued the trial court had improperly taken judicial notice of substantive evidence presented in the Naranjo case and had decided issues beyond the scope of the parties' motions, specifically in ruling that the failed tire had a design or manufacturing defect. Attached to Bridgestone's motion for

---

[5]Both below and on appeal, Bridgestone agreed that the judgment in the Naranjo case "would define the amount at stake" on any indemnity or contribution claim by A.P.S. And, A.P.S. implicitly agrees that its indemnity claim is limited to that portion of the Naranjo judgment that was allocated to their product liability claim, that is, thirty percent (or $2,861,951.40) of the total judgment.

6

reconsideration was an affidavit from a tire expert, who stated that the failed tire had no such defect, but rather, had failed due to punctures and improper repairs that were not attributable to the design or manufacturing process. After ordering a response from A.P.S., the trial court denied Bridgestone's motion without comment. This appeal followed the court's entry of judgment in favor of A.P.S. pursuant to Rules 54(b) and 56, Ariz. R. Civ. P., 16 A.R.S., Pt. 2.

## DISCUSSION

## I.

¶11        The trial court's summary judgment ruling was primarily based on § 12-684. Enacted in 1978, that statute provides in pertinent part:

> A. In any product liability action where the manufacturer refuses to accept a tender of defense from the seller, the manufacturer shall indemnify the seller for any judgment rendered against the seller and shall also reimburse the seller for reasonable attorneys' fees and costs incurred by the seller in defending such action, unless either paragraph 1 or 2 applies:
>
> 1. The seller had knowledge of the defect in the product.
>
> 2. The seller altered, modified or installed the product, and such alteration, modification or installation was a substantial cause of the incident giving rise to the action, was not authorized or requested by the manufacturer and was not performed in compliance with the directions or specifications of the manufacturer.

¶12        "Section [12-]684 is intended, in most circumstances, to place the burden and costs of defending products on their manufacturers." *Desert Golf Cars v. Yamaha Motor Co.*, 198 Ariz. 103, ¶ 11, 7 P.3d 112, 115 (App. 2000). Thus, a blameless manufacturer

7

might be liable for a seller's defense costs, even when no liability is found or judgment rendered against the seller. *McIntyre Refrigeration, Inc. v. Mepco Electra*, 165 Ariz. 560, 564, 799 P.2d 901, 905 (App. 1990). And, sellers of both new and used products may utilize § 12-684 to seek indemnity from manufacturers. *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 315, 660 P.2d 1236, 1242 (App. 1983). But, "when a seller modifies the product and that modification substantially causes the incident in question, then it is the seller who steps into the shoes of the manufacturer as being the one best situated to detect, control or prevent the putative defect." *Desert Golf Cars*, 198 Ariz. 103, ¶ 11, 7 P.3d at 115.

**¶13** The trial court concluded that § 12-684 "is a legislatively mandated procedure for vouching in/indemnification which differs from the common law vouching in and provides fewer defenses in order to carry out the legislature's intent to place the burden and costs of defending products on the manufacturer rather than Arizona retailers." As noted above, the court ruled that A.P.S. had properly served a valid tender of defense on the manufacturer, Bridgestone, which had refused to accept the tender. The trial court also ruled as a matter of law that the exception in § 12-684(A)(1) required the seller's actual, not merely constructive, knowledge of the product's defect. The court found "no material issues of fact or law that A.P.S. misused or altered the tire or had knowledge of the design or manufacturing defect in the product." Accordingly, the trial court concluded that

8

Bridgestone was obligated to fully indemnify A.P.S. for the thirty percent portion of the verdict in the Naranjo case that the jury had allocated to the Naranjos' product liability claim.

## II.

**¶14** We review de novo the trial court's grant of summary judgment and questions of statutory interpretation. *Bridgestone/Firestone North America Tire, L.L.C. v. Naranjo*, 206 Ariz. 447, ¶ 6, 79 P.3d 1206, 1208 (App. 2003). A motion for summary judgment should be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1); *see also Orme Sch. v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990).

**¶15** In interpreting statutes, "[o]ur primary goal is to discern and give effect to legislative intent." *State v. Kearney*, 206 Ariz. 547, ¶ 5, 81 P.3d 338, 340 (App. 2003). "To that end, we construe the statute's language, and if it is unclear, then consider its historical background, subject matter, context, effects, consequences, spirit, and purpose." *Id*. Of course, "a statute's language is the most reliable index of its meaning." *State v. Sepahi* , 206 Ariz. 321, ¶ 16, 78 P.3d 732, 735 (2003). We also are mindful of the "'universal rule that courts will not enlarge, stretch, or expand a statute to matters not falling within its express provisions.'" *Id*. ¶ 15, *quoting State ex rel. Morrison v. Anway*, 87 Ariz. 206, 209, 349 P.2d 774, 776 (1960).

**¶16** Nonetheless, "'[t]o discern the legislature's intent, we may consider the effect and consequences of alternative construction.'" *Way v. State*, 205 Ariz. 149, ¶ 10, 67 P.3d

9

1232, 1236 (App. 2003), *quoting Forino v. Arizona Dep't of Transp.*, 191 Ariz. 77, 80, 952 P.2d 315, 318 (App. 1997).  In addition, we attempt to read statutes in a "common-sense and contextualized" manner. *Arizona Libertarian Party v. Schmerl*, 200 Ariz. 486, ¶ 11, 28 P.3d 948, 952 (App. 2001); *see also United States v. Superior Court*, 144 Ariz. 265, 278, 697 P.2d 658, 671 (1985) ("We must interpret the statute with common sense and, if possible, in a manner consistent with constitutional principle.").

## III.

¶17        Bridgestone contends on several grounds that A.P.S.'s tender of defense was improper, thereby defeating any claim for indemnity.  As it did below, Bridgestone first argues that because its subsidiary BFMX actually manufactured the tire, A.P.S. directed its tender of defense to the wrong entity.  Relying on *Torres v. Goodyear Tire & Rubber Co.*, 163 Ariz. 88, 786 P.2d 939 (1990), the trial court rejected that argument, finding that Bridgestone was responsible for its subsidiary's product.  The trial court therefore deemed Bridgestone the tire's manufacturer for purposes of § 12-684 and ruled that A.P.S. had provided a "timely and sufficient" tender of defense to the appropriate entity.

¶18        In *Torres*, Goodyear, a tire manufacturer, essentially disclaimed responsibility for a defective tire produced by its wholly owned British subsidiary and trademark licensee, Goodyear GB.  Noting that Arizona's product liability statutes included a broad definition of "manufacturer," *see* A.R.S. § 12-681(1), our supreme court determined that

> under Arizona law a trademark licensor may be held liable
> where a licensee marketed the defective, unreasonably

10

dangerous product as the licensor's, where the licensor's relationship with the technical manufacturer or seller made it a significant participant in the enterprise by which the product is brought to market, and where the licensor controlled or had the ability to control the design, manufacture, or quality of the merchandise.

163 Ariz. at 96-97, 786 P.2d at 947-48.

¶19 Here, Bridgestone itself provided the evidence of its corporate relationship with BFMX. In support of its cross-motion for partial summary judgment, Bridgestone submitted the affidavit of Brian Queiser, a senior product engineer familiar with the corporate structure of Bridgestone and its subsidiaries. He stated that BFMX had manufactured the tire in Mexico in 1998. He further stated that until December 2001, BFMX had been a subsidiary of Bridgestone/Firestone, Inc. (BFS) and that BFS later had merged into Bridgestone. Bridgestone had later transferred its ownership interest in BFMX to Bridgestone/Firestone Americas Holding, Inc., Bridgestone's parent company. Therefore, when the tire in question was manufactured, Bridgestone's predecessor in interest owned BFMX.

¶20 Queiser, however, further declared that BFMX was an "independent entity," "solely responsible for the manufacture of tires fabricated" at its Mexican facility. He stated that BFMX produced and distributed the type of tire at issue in Mexico and had its own marketing organization. Moreover, neither Bridgestone nor BFS had ever imported the tires to the United States or sold them as original equipment on vehicles sold in the United States. Finally, Queiser stated that, although it "would not be unusual" for BFMX to use manufacturing specifications provided by Bridgestone, BFMX would "necessarily" have had

11

to adapt such specifications to "the equipment and processes in place at its manufacturing facility."

¶21        In rejecting Bridgestone's argument and finding this case "substantially similar" to *Torres*, the trial court stated:

> [Bridgestone] does not dispute that at the time of the Naranjo accident and tender of defense, [Bridgestone] was a trademark licensor to BFMX, that BFMX was a wholly owned subsidiary of [Bridgestone], that BFMX manufactured the tire in compliance with [Bridgestone]'s standards and specifications, and that the tire bore the Bridgestone/Firestone trademark.[6]

The trial court further noted Bridgestone's response to an earlier consumer warranty claim, submitted by A.P.S. and involving the same model of tire from the same vehicle.[7] Bridgestone had accepted the failed tire for inspection and, although it denied warranty coverage, had not rejected the claim because BFMX rather than it had manufactured the tire.

¶22        Queiser's affidavit does not clearly establish that Bridgestone was a trademark licensor to BFMX or that Bridgestone directly controlled the distribution of BFMX tires. But

---

[6]The hearing on the parties' cross-motions for summary judgment was not reported. But when specifically asked at oral argument in this court about the facts set forth in ¶21 above, Bridgestone only questioned the finding that BFMX had manufactured the tire in compliance with Bridgestone's standards and specifications, correctly noting that the record did not clearly establish that. In any event, in the absence of a transcript of the hearing below, we presume the record supports the trial court's recitation of undisputed facts. *See In re Estate of Mustonen*, 130 Ariz. 283, 284, 635 P.2d 876, 877 (App. 1981).

[7]Several months before the Naranjo accident, the right front tire on the same rental van suddenly failed. A.P.S. took that tire to a local Bridgestone service center and, at its direction, later sent it to Bridgestone headquarters in Tennessee for inspection. Bridgestone denied warranty coverage, claiming that the tire had failed because an old puncture had damaged the tread and allowed moisture to enter the tire.

the affidavit does establish that, during the relevant time frame, BFMX was a subsidiary of Bridgestone or its predecessor in interest. *See Torres*, 163 Ariz. at 94, 786 P.2d at 945 ("The parent company owns the subsidiaries, designates their directors and officers, allocates the capital needed and used by the subsidiaries, and enjoys the profits made by them. Certainly the brain that so competently and thoroughly directs the entire enterprise must be liable for the acts of its appendages."). Furthermore, although Queiser did not investigate whether the tire in question had been made according to Bridgestone specifications, he stated that Bridgestone regularly provided such specifications to BFMX and that it "would not be unusual" for the tire to have been made using Bridgestone specifications. *See id.* at 95-96, 786 P.2d at 946-47 (Trademark licensors "who significantly participate in the overall process by which the product reaches its consumers, and who have the right to control the incidents of manufacture or distribution" may be subject to liability.).

**¶23**     Bridgestone argues the evidence provided by Queiser falls short of the evidence presented in *Torres* and notes A.P.S. did not demonstrate that a licensor/licensee relationship existed between Bridgestone and BFMX or that the tire in question actually was manufactured according to Bridgestone's standards and specifications. But this overlooks the essentially undisputed facts noted in ¶ 21, *supra*. And, as the court in *Torres* stated, the "realities of the marketplace" must be recognized in addition to technical corporate form and organization:

> [W]e do not believe it is good law to allow multinational firms
> the freedom to compartmentalize strict liability . . . .

13

. . . .

> The marketplace, as described by the facts of this case, indicates very clearly that we deal with a tire designed to be a Goodyear tire, produced, packaged, advertised, and sold as a Goodyear tire, and warranted by Goodyear. To hold, as we are asked, that when the product is defective and unreasonably dangerous it should not be considered a "Goodyear" tire but a "Goodyear GB" tire would be to espouse a doctrine that would no doubt surprise most Goodyear customers, and perhaps some officers of Goodyear itself.

*Id.* at 92-93, 786 P.2d at 943-44. Here, the "realities of the marketplace," the evidence produced by Bridgestone, and other pertinent facts which it apparently did not dispute show that the tire in question was a "Bridgestone" tire, rather than a "BFMX" tire.

¶24 We agree with Bridgestone that the evidence produced in this case is less comprehensive than that produced in *Torres*, that the ruling in that case was based on its particular facts, and that our supreme court's answer to the certified question there was "sometimes yes and sometimes no, depending on the facts." *Id.* at 90, 786 P.2d at 941. Nonetheless, the record does not support Bridgestone's broad assertion that it "was not involved in any way with the marketing, distribution or sale of the tire." In strictly organizational terms, Bridgestone might be correct; but in "realit[y]," the tire was marketed, distributed and sold as a "Bridgestone." Accordingly, *Torres* supports the trial court's determination that Bridgestone could be liable for its subsidiary's allegedly defective product and was not an improper recipient of A.P.S.'s tender of defense.

14

**IV.**

¶25    Bridgestone also contends the tender of defense was improper because a fundamental, inherent conflict of interest existed between itself and A.P.S.  That conflict, Bridgestone further argues, "invalidated" the tender, prevented it from assuming A.P.S.'s defense in the Naranjo case, and "negates any indemnity obligation under [§] 12-684."

¶26    Both sides agree that § 12-684 contemplates and implicitly requires a "proper" tender of defense, even though the statute does not expressly so provide.  The parties further agree that A.P.S.'s tender of defense was sufficient in form and content.[8]  According to A.P.S., that fact alone renders its tender "proper" for purposes of statutory indemnity under § 12-684.

¶27    In contrast, Bridgestone contends an otherwise sufficient tender should be deemed "improper" or "fatally deficient" if the indemnitor's acceptance of the tender would place the indemnitor and indemnitee in a conflict situation.  In other words, Bridgestone argues, when an inherent conflict of interest exists between an indemnitee and indemnitor,

---

[8]The letter in which A.P.S. tendered its defense was sufficient because it detailed the substance of the Naranjos' allegations, enclosed a copy of their complaint (which alleged the tire was defective), and quoted A.R.S. § 12-684(A) in its entirety.  *See, e.g., Cunningham v. Goettl Air Conditioning, Inc.*, 194 Ariz. 236, ¶ 20, 980 P.2d 489, 493-94 (1999) (tender was valid when indemnitor had notice of action and copy of complaint and was informed of litigation's progress); *Dearborn Ins. Co. v. Int'l Surplus Lines Ins. Co.*, 719 N.E.2d 1092, 1097 (Ill. App. Ct. 1999) (letter enclosing copy of complaint constituted sufficient tender); *see also Foremost-McKesson v. Allied Chemical Co.*, 140 Ariz. 108, 111, 680 P.2d 818, 821 (App. 1983); *Litton Sys., Inc. v. Shaw's Sales & Serv., Ltd.*, 119 Ariz. 10, 14, 579 P.2d 48, 52 (App. 1978); Restatement (Second) of Judgments § 57, cmt. e (1982).

15

the latter may reasonably refuse to accept the tender without being exposed to a potential statutory indemnity obligation based on that refusal. Relying primarily on Restatement (Second) of Judgments § 57 (1982) (hereafter Restatement § 57) and other common law principles, Bridgestone contends an inherent conflict of interest existed between itself and A.P.S.

¶28        In pertinent part, Restatement § 57 states:

> (2)    If there is a conflict of interest between the indemnitee and the indemnitor regarding the injured person's claim against the indemnitee, so that the indemnitor could not properly have assumed the defense of the indemnitee, a judgment for the injured person precludes the indemnitor only with respect to issues determined in that action as to which:
>
>        (a) there was no conflict of interest between the indemnitee and the indemnitor; and
>
>        (b) the indemnitee conducted a defense with due diligence and reasonable prudence.
>
> (3)    A "conflict of interest" for purposes of this Section exists when the injured person's claim against the indemnitee is such that it could be sustained on different grounds, one of which is within the scope of the indemnitor's obligation to indemnify and another of which is not.

*See also Cunningham v. Goettl Air Conditioning, Inc.*, 194 Ariz. 236, ¶ 14, 980 P.2d 489, 492 (1999) (looking to Restatement § 57 "[i]n the absence of statutory and case authority that directly speaks to [the] issue").

¶29        Similarly, this court has observed, albeit in a case that involved neither a product liability claim nor § 12-684,

16

even if indemnification principles were applied there was no duty to defend in this case because of the conflict of interest between [the indemnitee] and [the indemnitor]. . . . In these circumstances, a properly notified indemnitor need not defend and is free to contest the basis of its liability in a subsequent action.

*Industrial Indem. Co. v. Beeson*, 153 Ariz. 317, 319, 736 P.2d 800, 802 (App. 1986), *citing* Restatement § 57. Thus, under common law, a conflict of interest between an indemnitor and indemnitee might justify a properly notified indemnitor's refusal to assume the indemnitee's defense in the underlying action. As the Restatement explains:

> In such circumstances, it is to the interest of the indemnitee that, if liability be established against him, it be established on a ground within the indemnity obligation so that he can shift the loss to the indemnitor. It is to the interest of the indemnitor that, if liability be established against the indemnitee, it be on a ground outside the indemnity obligation. Neither of them could defend the action in a way that would fairly protect the interests of the other in all respects. Because of the conflict, the indemnitor cannot properly be called on to take control of the defense of the action, for he would be required either to sacrifice his own interests without a fair opportunity to litigate questions concerning his liability or to commit a breach of his duty to conduct a vigorous defense of the indemnitee. . . .
>
> . . . .
>
> When, because of conflict of interest between the indemnitee and indemnitor, the indemnitor cannot properly take over the defense of the indemnitee, the situation is one of a justified refusal by the indemnitor to defend the action.

Restatement § 57, cmt. c.

17

**¶30** The trial court ruled that no conflict of interest actually existed between Bridgestone and A.P.S. We disagree.[9] We first note that the plaintiffs in the Naranjo case were not concerned about how or when the defect in the tire arose—at the time of manufacture or sometime later in the chain of distribution. They had no obligation to present such evidence. *See Mineer v. Atlas Tire Co.*, 167 Ariz. 315, 317, 806 P.2d 904, 906 (App. 1990), *quoting Prutch v. Ford Motor Co.*, 618 P.2d 657, 660 (Colo. 1980) ("'[T]he plaintiffs' burden is limited to showing a defect existed at the time the [product] in question first came into the plaintiffs' possession.'"). Indeed, the Naranjos argued in that case that the tire was "defective and unsafe <u>at the time of rental</u>," and, therefore, that it "d[id] not matter whether the defective condition existed when [Bridgestone] sold the tire initially, or whether the defective condition [wa]s the result of maintenance, repair, care and use of the tire." Thus, the Naranjos consistently maintained they had no burden to show the cause or timing of the tire defect, only that it existed at the time of the rental.

**¶31** In contrast, to secure its indemnity claim against Bridgestone, A.P.S. wanted to show that the tire was defective when it left Bridgestone's control. *See Dixon v. Fiat-Roosevelt Motors, Inc.*, 509 P.2d 86, 90-91 (Wash. Ct. App. 1973) (retailer's and

---

[9]At oral argument, A.P.S. acknowledged that its interests and Bridgestone's probably did conflict. But A.P.S. argued that conflicts of interest between the manufacturer and ultimate seller typically would arise in cases such as this involving used products, and that any such conflicts are irrelevant under § 12-684. The trial court agreed with the latter proposition but also erroneously found no conflict of interest existed between Bridgestone and A.P.S.

18

manufacturer's positions were in conflict because retailer sought "to show the alleged defect occurred at the time of manufacture," whereas manufacturer sought "to show the defect occurred subsequent to the time the wheel left" its control); *see also* Restatement § 57, cmt. c. Toward that end, A.P.S. attempted in the Naranjo case to attribute all of the fault to Bridgestone, presenting an expert who testified that the tire had failed because of a manufacturing or design defect. And A.P.S. repeatedly argued that theory to the jury.

¶32         Although Bridgestone was not a party to the Naranjo case, its interest obviously would have been to minimize its liability by proving that the tire had neither a manufacturing nor design defect when Bridgestone placed it into the stream of commerce. *See Jimenez v. Sears, Roebuck & Co.*, 183 Ariz. 399, 402, 904 P.2d 861, 864 (1995) (prima facie case of strict product liability against manufacturer includes proof that product defective and unreasonably dangerous when it left manufacturer's control); *Dietz v. Waller*, 141 Ariz. 107, 110, 685 P.2d 744, 747 (1984) (same); *Piper v. Bear Med. Sys., Inc.*, 180 Ariz. 170, 173, 883 P.2d 407, 410 (App. 1993) (same); Restatement § 57, cmt. c. According to Bridgestone, had it been a party to the Naranjo case, "it would have presented expert testimony that the only defects were puncture holes and improper repairs." And, as Bridgestone observes, the Naranjos' negligence claim against A.P.S. fell outside any indemnity obligation and, therefore, "would have created an insurmountable conflict." *See* Restatement § 57(3), cmt. c and Illustration 4.

19

¶33 In short, the divergent positions of Bridgestone and A.P.S. created an irreconcilable conflict of interest between them. *See Dixon*, 509 P.2d at 90-91. The question, then, is what effect that conflict has on A.P.S.'s statutory indemnity claim. For several reasons, we agree with A.P.S. that the conflict does not render its tender of defense "improper" or otherwise negate A.P.S.'s right to indemnity under § 12-684(A).

¶34 First, the legislature has clearly mandated that a manufacturer that rejects a proper tender of defense from a seller "*shall* indemnify the seller for any judgment rendered against the seller," subject only to the two, expressly stated statutory exceptions. § 12-684(A) (emphasis added). As Bridgestone acknowledges, under § 12-684, "a manufacturer who refuses to accept a proper tender of defense is required to indemnify the seller for a verdict based upon strict liability absent either the seller's knowledge of the defect or product modification." The statute does not include a "conflict of interest" exception or defense. If the legislature had wanted to include such an exception, it could and presumably would have done so. *See State v. Fell*, 203 Ariz. 186, ¶¶ 9, 13, 52 P.3d 218, 220-22 (App. 2002).

¶35 Second, Bridgestone cites no authority, nor have we found any, for the proposition that a conflict of interest between indemnitor and indemnitee invalidates the latter's tender of defense or otherwise renders it "improper." Restatement § 57(2) states that a conflict of interest might prevent the indemnitor from "properly . . . assum[ing] the defense of the indemnitee." But that section does not suggest that the tender of defense itself is improper.

20

¶36        Third, as A.P.S. remarked at oral argument, if Bridgestone's position were the law, it would essentially "gut" the statute in cases such as this involving used products. Despite the inherent conflict between the parties, we do not view this case as particularly unusual or anomalous. Product liability cases involving used products that deteriorate with age and usage might easily pit the ultimate seller against the manufacturer. That is particularly so when, as here, the product admittedly was defective at the time it was last sold or leased before the accident. Under such circumstances, both the manufacturer and ultimate seller would have an interest in and incentive to "point the finger" at each other. The manufacturer would seek to disprove any design or manufacturing defect in the product when it left its hands, and the ultimate seller would seek to establish such defect and disprove or minimize any independent negligence on its part.

¶37        Fourth, from a practical standpoint, the conflict of interest did not require Bridgestone to reject A.P.S.'s tender of defense. Had Bridgestone instead accepted the tender, it presumably could and would have retained counsel of its choice to defend A.P.S. in the Naranjo case.[10] And, in that event, neither the handling of the defense nor the outcome

---

[10]In that situation, of course, the manufacturer will bear the cost of defending the seller in the underlying action and might be unable to recoup that cost should the manufacturer ultimately prevail in a subsequent indemnity action. But that cost often will pale in comparison to the amount of the manufacturer's ultimate indemnity liability if the manufacturer refuses to accept the tender and later cannot establish one of the two exceptions under § 12-684(A). In addition, as Bridgestone acknowledges, a manufacturer might be required to indemnify (or reimburse) the seller for defense costs incurred in the underlying tort action even when no product defect was proven. *See Desert Golf Cars v. Yamaha Motor Co.*, 198 Ariz. 103, ¶ 15, 7 P.3d 112, 116 (App. 2000) ("[A] favorable defense verdict [in the

of that case necessarily would have been any different. Even if defended by counsel retained by Bridgestone, A.P.S. still would have sought to decrease the percentage of fault allocated to the Naranjos' negligence claim and increase the percentage allocated to their product liability claim.

¶38        In short, had Bridgestone accepted A.P.S.'s tender of defense in the Naranjo case, A.P.S. presumably would have done precisely what it actually did—present a defense that in essence blamed the accident on a manufacturing or design defect in the tire, rather than on any independent negligence on A.P.S.'s part. That scenario, however, would have precluded Bridgestone's indemnity liability under § 12-684(A) because that statute premises any indemnity obligation on the manufacturer's "refus[al] to accept a tender of defense." Thus, had Bridgestone accepted the tender, A.P.S. would not have had any right to statutory indemnity under § 12-684(A), regardless of the resulting verdict and judgment in the Naranjo case and regardless of any factual determinations made in that case.

¶39        Although A.P.S. still might have pursued a common law claim for indemnity, Bridgestone would have been entitled to raise any available common law defenses and fully

_____

underlying tort action] does not preclude indemnity."); *McIntyre Refrigeration, Inc. v. Mepco Electra*, 165 Ariz. 560, 564, 799 P.2d 901, 905 (App. 1990) ("[A] manufacturer's product need not be proven to be defective to render the manufacturer liable for the seller's defense costs."); *Hellebrandt v. Kelley Co.*, 153 Ariz. 429, 737 P.2d 405 (App. 1987) (same). Nonetheless, we recognize that the statute potentially places manufacturers in a quandary in situations such as this, when the case involves a used product, the ultimate seller and manufacturer have a clear conflict of interest, and the manufacturer is not a party to the underlying tort action.

22

litigate that claim, for example, by presenting evidence that the tire had no design or manufacturing defect when it left Bridgestone's control.[11] Thus, had Bridgestone accepted A.P.S.'s tender and assumed its defense, it would have preserved its right to litigate the nature and extent of any indemnity obligation owed to A.P.S., but arguably not issues as to which there was no conflict of interest between them (for example, the Naranjos' damages). *See* Restatement § 57(2)(a), cmt. c and Illustration 5. In sum, the conflict between Bridgestone and A.P.S. did not invalidate or negate the latter's tender of defense.

---

[11]The trial court implicitly ruled that the jury in the Naranjo case had found a "design or manufacturing defect in the product." But we agree with Bridgestone that no such determination was made on either "the nature of the tire defect or the time at which it arose." Accordingly, in any common law indemnity action, Bridgestone would have been entitled to litigate those issues, even had it assumed A.P.S.'s defense. *See* Restatement § 57(1)(b), (2), cmt. a (indemnitor only precluded from relitigating issues "determined" in underlying action against indemnitee whether or not parties had conflict of interest); *see also SCAC Transport (USA) Inc. v. SS Danaos*, 845 F.2d 1157, 1162 (2d Cir. 1988) (preclusive effect of underlying judgment on a properly "vouched-in" indemnitor does not extend to issues not actually determined in the first proceeding); *Collins v. Miller & Miller, Ltd.*, 189 Ariz. 387, 397, 943 P.2d 747, 757 (App. 1996); *Dixon*, 509 P.2d at 91 ("Neither the doctrine of collateral estoppel nor the vouching-in doctrine can be applied to preclude litigation of issues which were previously unlitigated."). Moreover, even if issues relating to the nature, timing, and source of the tire's defect had been determined in the Naranjo case, Bridgestone (as a nonparty to that case) would not have been bound by those determinations in a subsequent, common law indemnity action because of the parties' conflict of interest. *See* Restatement § 57(2), (3); *see also* A.R.S. § 12-2506(B); *cf. Farmers Ins. Co. v. Vagnozzi*, 138 Ariz. 443, 448, 675 P.2d 703, 708 (1983) ("[W]here there is a conflict of interest between an insured and his insurer, the parties will not be estopped from litigating in a subsequent proceeding those issues as to which there was a conflict of interest, whether or not the insurer defended in the original tort claim."). And, in such action, Bridgestone would have been entitled to fully litigate not only the defect-related issues but also the percentage of fault attributable to A.P.S.'s independent negligence rather than to the product's defect. Restatement § 57, cmt. c.

**V.**

**¶40**         Bridgestone also argues A.P.S.'s "utter and complete failure to defend the strict liability claim" in the Naranjo case forecloses indemnity.  In support of that proposition, Bridgestone relies on Restatement § 57(2)(b), *Cunningham*, and *Falcon v. Beverly Hills Mortgage Corp.*, 168 Ariz. 527, 815 P.2d 896 (1991).  Under Restatement § 57(2)(b), when a conflict of interest exists between the indemnitee and prospective indemnitor, the latter has no indemnity obligation if the indemnitee failed to "conduct[] a defense with due diligence and reasonable prudence."  *See Cunningham*, 194 Ariz. 236, ¶¶ 19, 21, 980 P.2d at 493-94.

**¶41**         The record clearly supports Bridgestone's contention that A.P.S. not only failed to diligently defend against the product liability claim in the Naranjo case, but also "affirmatively blamed [Bridgestone] for the defect in the tire and the underlying accident."  A.P.S. does not suggest otherwise.  Nonetheless, as the trial court correctly noted, § 12-684 does not condition indemnity rights on an indemnitee having diligently defended the product or the manufacturer's interests, particularly when the manufacturer rejects a tender of defense.  If Bridgestone "'was of the view that it could defend the case better with its own lawyers, it had full opportunity to do so but declined.'"  *Litton Sys., Inc. v. Shaw's Sales & Serv., Ltd.*, 119 Ariz. 10, 14, 579 P.2d 48, 52 (App. 1978), *quoting Hessler v. Hillwood Mfg. Co.*, 302 F.2d 61, 63 (6th Cir. 1962).

**¶42**         As A.P.S. points out, "[i]f a manufacturer declines a tender and leaves the seller to fend for itself, it gambles on its ability to later prove one of the statutory exceptions"

under § 12-684(A). And, as A.P.S. also observes, after Bridgestone failed to accept its tender of defense, A.P.S. "had to make a tactical decision on whether to defend the tire or admit it was defective and defend the remaining allegations." Thus, the manner or strategy of A.P.S.'s defense in the Naranjo case does not relieve Bridgestone of its statutory indemnity obligation.

## VI.

¶43        Bridgestone also argues that saddling it with a statutory indemnity obligation based on a strict construction of § 12-684(A) would contravene other well-established common law principles and be "fundamentally unfair." As noted in ¶ 32, *supra*, under common law, a manufacturer may be held strictly liable in tort only if its product is defective and unreasonably dangerous at the time the product left the manufacturer's control. *See Jimenez*; *Piper*; *Jordan*; *see also* A.R.S. § 12-683(2). A defect that existed when the product left the manufacturer's control would render both the manufacturer and seller strictly liable. *See Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 293, 640 P.2d 851, 855 (1982). On the other hand, a defect not attributable to the design or manufacture of the product and that arose after the product left the manufacturer's control would render

25

only the seller strictly liable.[12]  *See* § 12-683(2); *Dietz*; *Caruth v. Mariani*, 11 Ariz. App. 188, 191, 463 P.2d 83, 86 (1970).

¶44      A manufacturer's indemnity obligation, Bridgestone contends, should be no greater than its primary duty to the person injured by the allegedly defective product.  Thus, Bridgestone further argues, a manufacturer should not be required to indemnify a seller for a "defect that arose after the product left the manufacturer's control."  To do so, it argues, "render[s] a manufacturer derivatively liable for indemnity in situations where the manufacturer would have no primary liability to the injured party" and "would transform manufacturers into absolute insurers against defects causing injury."

¶45      Based on the foregoing common law principles, Bridgestone contends it is entitled to its "day in court on APS's claim for indemnity" to litigate all relevant issues bearing on that claim, including the nature, cause, and time of origination of the tire defect.  According to Bridgestone, the law should not require it to indemnify A.P.S. based on its reasonable refusal to accept A.P.S.'s tender of defense, and without affording Bridgestone an opportunity to litigate the indemnity-related issues.

¶46      Although we find Bridgestone's arguments somewhat persuasive, we cannot accept them.  Section 12-684(A) does not condition a seller's indemnity rights on any of the

---

[12]A manufacturer can also be held strictly liable in tort for "informational defects encompassing instructions and warnings," but no such claim is at issue here.  *Gosewisch v. Am. Honda Motor Co.*, 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987); *see also Golonka v. Gen. Motors Corp.*, 204 Ariz. 575, 65 P.3d 956 (App. 2003).

common law factors Bridgestone cites. For example, as A.P.S. points out, "the statute does not require proof that the product was defective or that the defect originated with the manufacturer." Contrary to Bridgestone's argument, the statute does not condition a manufacturer's indemnity obligation on the seller's "showing that the defect arose from the manufacturing process itself." In that same vein, Bridgestone contends "an otherwise innocent seller is entitled to indemnity from the manufacturer, both at common law and under [§] 12-684, *if* the seller can actually show that the defect existed when the product left the manufacturer's hands." But even if common law supports that proposition, § 12-684(A) has no such condition.

## VII.

¶47 In sum, the various common law principles and defenses on which Bridgestone relies are unavailing under § 12-684(A). Neither the conflict of interest between A.P.S. and Bridgestone nor A.P.S.'s handling of its defense in the Naranjo case invalidated A.P.S.'s tender of defense or negated Bridgestone's statutory obligation to indemnify A.P.S. Because of its refusal to accept the tender of defense, Bridgestone was obligated to "indemnify the seller for any judgment rendered against the seller," unless either of the two statutory exceptions applied. § 12-684(A).

¶48 In support of a contrary conclusion, Bridgestone argues that we should superimpose the various common law principles discussed above, including those embodied in Restatement § 57, on § 12-684 and interpret and apply the statute consistently with those

principles. According to Bridgestone, "[t]he scope of a manufacturer's indemnity obligation under [§] 12-684 must be construed in light of common-law rules of indemnity."

¶49        Bridgestone relies primarily on A.R.S. § 12-682 for that argument. That statute provides: "The previously existing common law of products liability is modified only to the extent specifically stated in this article and § 12-551." *See also Torres*, 163 Ariz. at 96, 786 P.2d at 947 (noting that § 12-682 "expressly disclaim[s] any limitation of the existing common law of product liability"). Bridgestone also cites our supreme court's dicta in *Torres* that the product liability statutes do not "attempt to oust [the supreme] court from the evolution of product liability law." *Id*.; *see also McIntyre Refrigeration*, 165 Ariz. at 565, 799 P.2d at 906 ("The common law formed the legal context in which the legislature acted in enacting an indemnity statute addressed to product liability actions in particular."); *cf.* A.R.S. § 1-201 (adopting common law as "rule of decision" in all Arizona courts, but only so far as it is "not repugnant to or inconsistent with . . . laws of this state").

¶50        We are not persuaded by Bridgestone's argument. Although § 12-684(A) clearly does change some aspects of the common law relating to indemnity claims by sellers against manufacturers, the legislature apparently intended such change. And, insofar as § 12-684(A) alters the common law of products liability,[13] § 12-682 expressly permits that "to the

---

[13]A.P.S. argues § 12-682 is inapplicable here because § 12-684 does not purport to change "[t]he previously existing common law of *products liability*." § 12-682 (emphasis added); *see also* A.R.S. § 12-681(3) (defining "[p]roduct liability action" but not encompassing indemnity action by seller against manufacturer). We do not necessarily agree with that distinction and, in any event, do not decide this issue on that basis.

extent specifically stated" in the statutes. As our supreme court noted in *Torres*, § 12-684 expressly "provide[s] for indemnification between manufacturers and sellers." 163 Ariz. at 96, 786 P.2d at 947. Thus, we agree with A.P.S. that § 12-684(A) "merely provides a statutory indemnity claim separate and apart from common law indemnity."

¶51         Absent any constitutional infirmity, therefore, the statute controls and is unaffected by common law principles.[14] Were we to interpret § 12-684(A) by importing Bridgestone's common law and policy arguments into the statute, "[s]uch an interpretation in effect [would] amend[] the statute to require proof of elements not set forth by the legislature." *Sepahi*, 206 Ariz. 321, ¶ 15, 78 P.3d at 735; *see also McIntyre Refrigeration*, 165 Ariz. at 565, 799 P.2d at 906, *quoting City of Phoenix v. Donofrio*, 99 Ariz. 130, 133, 407 P.2d 91, 93 (1965) ("'[A] court will not inflate, expand, stretch or extend a statute to matters not falling within its expressed provisions.'") (alteration in *McIntyre*). That we will not do, because any such amendment falls within the legislative prerogative. If the statute might produce unintended or unfair results in some cases, it is the role of the legislature, not this court, to clarify or change the statute.[15]

---

[14]To the extent Bridgestone contends § 12-684(A) violates due process, we find no merit to the argument and no support for it in *Desert Golf Cars*, on which Bridgestone relies. *See Litton Sys.*, 119 Ariz. at 14, 579 P.2d at 52 ("Binding the indemnitor to a judgment against the indemnitee, where the indemnitor has received due notice of the pending litigation, is not a denial of due process.").

[15]We note, however, that the statutory scheme is not necessarily unfair or impractical. Under § 12-684, a manufacturer may avoid the dire consequences Bridgestone postulates by either accepting the seller's tender of defense or later proving one of the statutory exceptions. *See* ¶¶ 37-39 and nn.10-11, *supra*.

**VIII.**

¶52        Bridgestone further contends the record contains triable issues of fact on one or both of the statutory exceptions in § 12-684, thereby precluding summary judgment. We therefore turn our analysis to those exceptions.

¶53        We first note that the manufacturer bears the burden of proving one of the exceptions under § 12-684(A)(1) or (2). *See Desert Golf Cars*, 198 Ariz. 103, ¶ 23, 7 P.3d at 117; *see also Harvest v. Craig*, 195 Ariz. 521, ¶ 15, 990 P.2d 1080, 1083 (App. 1999) (when statute grants benefit but also contains exception to benefit, and the exception does not appear in portion of statute granting the benefit but appears in another clause, party seeking benefit of exception has burden of proving its entitlement thereto); *Troutman v. Valley Nat'l Bank*, 170 Ariz. 513, 517, 826 P.2d 810, 814 (App. 1992) (party claiming to fall "within a recognized exception to the statute" has burden of showing exception applies).

¶54        We also note that both exceptions specifically refer to "[t]he seller," rather than more broadly to any party in the chain of distribution that might have handled, marketed, or sold the product after it left the manufacturer's hands and before the ultimate seller obtained it. § 12-684(A)(1), (2). Thus, that some party in the chain of distribution other than the final seller might have known of the defect or might have altered, modified, or installed the product does not relieve the manufacturer of its indemnity obligation to the final seller under § 12-684. We therefore disagree with Bridgestone's unsupported contention that § 12-684(A)(2) "forecloses indemnity in situations where the underlying injuries resulted from an

30

alteration of the product for which the seller is responsible," even if the seller itself did not alter, modify, or install the product.

¶55      In support of that proposition, Bridgestone relies on dicta in *Jordan*. In holding that sellers of used goods may be subject to strict liability in tort, Division One of this court noted that, "whether the product is new or used," "the dealer will not be able to obtain indemnity from the manufacturer if there has been a substantial change in the product since it left the manufacturer." 135 Ariz. at 315, 660 P.2d at 1242. The court in *Jordan*, however, did not analyze or interpret the specific language of § 12-684(A)(2) and later remarked that "Arizona law authorizes a seller to seek indemnity from a manufacturer without any limitation on whether the product is new or used." *Id.* But, to the extent the court suggested that the exception in § 12-684(A)(2) applies broadly to *any* post-manufacture alteration, modification, or installation of the product, even occurring before the final seller obtained the product, we disagree.

¶56      We also reject Bridgestone's assertion, based on dicta in *Western Agricultural Insurance Co. v. Chrysler Corp.*, 198 Ariz. 64, ¶ 25, 6 P.3d 768, 773 (App. 2000), that "some fault," of any kind, by the seller "in causing the incident that is the subject of the action" defeats indemnity under § 12-684(A). Rather, the only "fault" of significance under the statute is the seller's knowledge of the product's defect or the seller's unauthorized and causally related alteration, modification, or installation of the product.

31

¶57    We agree with the trial court that Bridgestone failed to establish either of the two exceptions and that the record does not reflect a triable issue of fact on those.  We also agree with the trial court that the first exception requires evidence of the seller's actual "knowledge of the defect in the product."  § 12-684(A)(1).  According to Bridgestone, the record presents disputed issues of fact on "whether APS had reason to know of the alleged defect at the time that it rented the van to the Naranjos."  Contrary to Bridgestone's argument, however, mere constructive knowledge does not suffice.

¶58    In construing a statute, "[w]e give words their usual and commonly understood meaning unless the legislature clearly intended a different meaning."  *State v. Korzep*, 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990); *see also* A.R.S. § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language.").  "In determining the ordinary meaning of a word, we may refer to an established and widely used dictionary."  *State v. Mahaney*, 193 Ariz. 566, ¶ 12, 975 P.2d 156, 158 (App. 1999).  The word "knowledge" is commonly understood to mean "[a]n awareness or understanding of a fact or circumstance."  *Black's Law Dictionary*, at 876 (7th ed. 1999); *see also The American Heritage Dictionary*, at 705 (2d college ed. 1991) (defining "knowledge" as "[t]he state or fact of knowing"); *Webster's Third New Int'l Dictionary*, at 1252 (1971) ("knowledge" is "the fact or condition of knowing something with a considerable degree of familiarity gained through experience of or contact or association with the individual or thing so known").  In contrast, "constructive knowledge" is essentially a legal fiction, referring to knowledge that

32

"one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Black's Law Dictionary*, at 876.

¶59    In general, when the legislature has chosen to employ a standard of actual or constructive knowledge, it has expressly so stated. *See, e.g.*, A.R.S. §§ 4-241(B) (liquor licensee who fails to obtain proof of age "is deemed to have constructive knowledge of the person's age"); 44-1531 (wilful violation of consumer fraud statute occurs when party "knew or should have known" conduct was prohibited); *cf.* A.R.S. § 13-107(B) (limitations period commences on state's actual discovery or discovery that should have occurred with exercise of reasonable diligence). That the legislature supposedly rejected a proposed amendment in 1978 to add the word "actual" before the word "knowledge" in § 12-684(A)(1) and has chosen to use the phrase "actual knowledge" in some other statutes does not alter our conclusion.[16] *See* A.R.S. §§ 14-3714; 29-319(D). The legislature might well have deemed the proposed amendment superfluous. Absent any meaningful legislative history to suggest that the legislature intended the word "knowledge" in § 12-684(A)(1) to include either actual or constructive knowledge, we decline to interpret the statute in that manner.[17] Rather, we

---

[16]The record does not contain the proposed, legislative amendment to which Bridgestone refers.

[17]At common law, courts have expressed differing views on this subject. *Compare Hales v. Green Colonial, Inc.*, 402 F. Supp. 738, 741 (W. D. Mo. 1975), *aff'd in part and modified and remanded in part on other grounds*, 544 F.2d 331 (8th Cir. 1976) ("[T]he weight of authority generally supports a cause of action for indemnity against the manufacturer of a defective product which has been found to be unreasonably dangerous where the seller seeking indemnity has no actual knowledge of the defect."), *with Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233, 242 (Mo. Ct. App. 1987) ("[A] 'seller' lower

33

give the word "knowledge" in (A)(1) its common, understood meaning—that the seller actually knew of the product's defect.

¶60 Bridgestone points to evidence presented in the Naranjo case but also included in this record that A.P.S. had known of the prior failure in the van's right front tire, had submitted that tire for inspection, had declined a request to inspect the remaining tires, and had rented the van to the Naranjos before obtaining the results from Bridgestone of the first tire inspection. Bridgestone also emphasizes that seventy percent of the jury's verdict in the Naranjo case was based on its finding of independent negligence against A.P.S. That negligence, Bridgestone asserts, included A.P.S.'s failure to inspect the tire, to warn the Naranjos of the prior incident involving the other tire, and to replace all of the tires after the prior incident. According to Bridgestone, all of the foregoing facts or implicit findings "show that APS acted negligently by introducing a product that it knew or should have known to be defective into the stream of commerce."

---

in the chain of distribution who sells a product without actual or constructive knowledge of a defect and who has no duty to inspect is entitled to indemnity against one higher in the chain, such as the manufacturer."). In any event, we do not necessarily disagree with Bridgestone's argument that an actual or constructive knowledge standard "would encourage sellers to be vigilant in monitoring product quality" and, at least with respect to used products, "would further the statutory goal of placing liability on the party best able 'to detect, control or prevent the putative defect.'" *Desert Golf Cars*, 198 Ariz. 103, ¶ 11, 7 P.3d at 115. In our view, however, the determination of whether such a standard should apply to a seller's claim for statutory indemnity rests with the legislature. *See Taylor v. Graham County Chamber of Commerce*, 201 Ariz. 184, ¶ 27, 33 P.3d 518, 525 (App. 2001) ("[W]hen, as here, the legislature has clearly spoken on a matter within its domain, its word constitutes public policy on that subject and controls, assuming no constitutional impediments exist.").

**¶61** None of those facts, however, permits a finding or inference that A.P.S. actually knew of any defect in the van's right rear tire when it leased the vehicle to the Naranjos. Thus, no genuine issues of material fact exist to preclude summary judgment against Bridgestone based on the exception in § 12-684(A)(1).

**¶62** The same is true with respect to the exception in § 12-684(A)(2). The trial court referred to "uncontested evidence at the Naranjo trial" that "A.P.S. did not misuse, alter or modify the [Bridgestone] tire in any way." Bridgestone challenges the trial court's having taken judicial notice of the entire record in the Naranjo case for substantive purposes, including the foregoing evidence. We need not address that issue, however, because, unlike the manufacturer in *Desert Golf Cars*, Bridgestone failed to present any triable issues of fact on the (A)(2) exception, on which it bore the burden of proof.

**¶63** In sum, the record does not present any genuine issue of material fact on either exception. In his affidavit attached to Bridgestone's motion for reconsideration below, Bridgestone's tire expert opined that the tire in question had failed as a result of previous punctures that had been improperly repaired. Assuming that evidence was timely presented below and properly before us, however, Bridgestone's expert did not state that A.P.S. (rather than some other entity) had known of the tire defect or had altered, modified, or installed the tire. Nor does any other evidence in the record support a finding or inference of those facts. Accordingly, the trial court did not err in granting summary judgment in favor of A.P.S. on its indemnity claim under § 12-684(A).

## CONCLUSION

**¶64** Because Bridgestone was statutorily obligated to indemnify A.P.S. under § 12-684(A), we do not address A.P.S.'s alternative claims for common law vouching in and indemnity or contribution, on which the trial court also granted summary judgment in favor of A.P.S. *See Foremost-McKesson*; *Litton Sys.*; *Dixon.* The trial court's summary judgment in favor of A.P.S. based solely on § 12-684(A) is affirmed.

_____
JOHN PELANDER, Presiding Judge

CONCURRING:


_____
PHILIP G. ESPINOSA, Chief Judge


_____
PETER J. ECKERSTROM, Judge